Edward A. Bannister v. Commissioner. Emily A. Bannister v. Commissioner.
Bannister v. Commissioner
Docket Nos. 3365, 3366.
United States Tax Court
1945 Tax Ct. Memo LEXIS 269; 4 T.C.M. (CCH) 304; T.C.M. (RIA) 45091; March 13, 1945
Sydney Livesey, Esq., and Winfield G. Boyd, C.P.A., P.O. Box 1247, Yakima, Wash., for the petitioners. Douglas L. Barnes, Esq., and W. H. Payne, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: Each of these cases involves a deficiency in income tax for the calendar year 1941 in the amount of $1,360.53. They were consolidated for hearing. Inasmuch as the petitioners are husband and wife, filing separate returns of income in which each reports one-half of the income of the community, it will be sufficient for present purposes to make findings of fact and discuss the questions in Docket No. 3365. Edward A. Bannister will therefore be referred to as the petitioner. The questions are whether the respondent erred: (1) in disallowing the deduction *270 of $3,400, claimed to have been sustained by reason of shares of stock of the Pacific Northwest Orchards Company becoming worthless; and (2) in holding that $1,075.50 deducted as interest was a capital expenditure. Findings of Fact Petitioner, a resident of Yakima, Washington, filed his income tax return for the taxable year with the collector of interal revenue for the district of Washington, including one-half of the net income of the community. It was stated in the return that it had been prepared on an accrual basis; but his books were kept on a cash basis, with inventories, which included his fruit on hand and his orchard supplies. Since 1912 petitioner has been engaged in the orchard business. About 1929 he, his general foreman, Clyde C. Hazen, and petitioner's cousin, Henry T. Buckman, decided to acquire some land and to develop a new pear orchard. In 1929 they put up a total of $34,000, petitioner contributing forty percent or $13,600, Buckman contributing a like amount and Hazen contributing $6,800. About the same time a corporation was organized under the laws of Washington with the name of Pacific Northwest Orchards Co. Its capital stock, consisting of 250 shares *271 of the par value of $100 per share, was issued 40 percent to petitioner, 40 percent to Buckman and 20 percent to Hazen. Three tracts of land were purchased under contract, one containing 80 acres of fully developed orchard, one containing a 10 acre orchard, and the other being a tract of land on which the parties planned to develop a pear orchard. The agreed purchase price for the first-mentioned tract was $34,000, $12,500 for the second and $9,000 for the third. Petitioner, who was an experienced orchard man, took over the operation and development of the properties. He opened a personal bank account in a local bank which was designated "Pacific Northwest Orchards Account." In the same bank he also maintained a personal account called "Pyramid Orchards Account." In the latter account deposits were made of funds derived by petitioner from the operation of properties owned by him individually. In the other the earnings of the three orchards were deposited. Advancements were made by petitioner from his personal account to the account carried for the benefit of the joint venture. In 1935 the 10 acre orchard and one of the 80 acre tracts were deeded to petitioner. Title to the other *272 tract had been taken in the name of the corporation. The parties found it expedient to take the title to the two tracts in petitioner's name so that he could negotiate and obtain a Federal Land Bank loan. Buckman endorsed the notes. The title to the two tracts stood in the name of petitioner until the date of the trial. The corporation maintained no bank account, kept no records, conducted no business, held no formal meetings of stockholders or directors and at no time actually functioned. It was a mere nominal titleholder of a portion of the property. Hazen has been petitioner's general foreman since 1918. Both he and Buckman had confidence in petitioner and his ability to operate the orchards. All of the details of the enterprise, including the keeping of books, were left to petitioner. No formal partnership agreement was signed; but from the beginning Hazen, Buckman and petitioner considered themselves to be partners in the handling and operation of the 170 acres of ground and orchards. During the early years of the operation prices of fruit were low and the expenses of acquiring and developing the new pear orchard, together with the expense of operation, exceeded the profits. *273 Petitioner made substantial advancements out of his personal bank account, keeping account thereof on his books. By 1938 the amount advanced by him aggregated, without interest, approximately $60,000. By 1936 the new pear orchard was beginning to bear and there had been considerable improvement in the prices of fruit. Petitioner, as an experienced orchard man, was confident "that the orchard industry would come back into its own." No effort was ever made by petitioner, by his associates, or by the corporation, to sell or dispose of any part of the 170 acres. In 1938 Buckman decided to leave Yakima because of eye trouble due partly to the sunshine and dry climate. At that time he transferred all of his stock in the corporation to petitioner "for a nominal consideration of $10." A year later, in September of 1939, he submitted to the corporation his resignation as secretary "to be effective forthwith." No action was ever taken in connection with the resignation and no successor was elected until in December of 1941 when a special meeting of the stockholders and directors was held for the purpose of dissolving the corporation, at which time the petitioner's attorney, who had been *274 employed for the purpose of dissolving the corporation, was designated as secretary. In 1939 petitioner "took over" the personal property of the joint venture and thereafter claimed, in his personal return of income, depreciation on the property, which consisted of a horse, spray plant, tractors, motors, pumps, tanks, etc. The detailers of the "taking over" are not shown in the record. Some income tax returns were filed in the name of the corporation. They were usually hastily prepared, on or about the last day for filing, by an accountant, from data furnished by petitioner. No taxable income was reported. On the corporation's returns for 1939 and 1940 the various lines were left blank, no income and no expenses being shown. Attached to each was a "general explanation" stating that on or about 12/31/38 it had been found that the corporation was so deeply indebted to Bannister (petitioner) that it would be impossible for it to carry on and therefore that he had taken over the orchards and conducted them "as if they were his own." A similar explanation was attached to the 1940 return in which it was stated that an actual transfer of all of the assets of the corporation had been *275 made to Bannister in 1939. No transfer was actually made to Bannister during either year. In petitioner's personal income tax return for the year 1939 he deducted a net long term loss of $3,400, the following explanation being shown on an attached schedule: Loss on Pacific Northwest Orchards stock… $13,600.00 Stock held over 2 years - allowable loss… 6,800.00 Assets of this corporation taken over by creditors as of 1/1/39 Late in the year 1941 an attorney was employed to attend to the details of formally dissolving the corporation. Appropriate notices were mailed, not only to petitioner and Hazen, the nominal stockholders at that time, but also to Buckman. Pursuant to that notice a meeting was held on December 16, 1941, attended by petitioner, the attorney and Hazen, at which it was resolved that the remaining property of the corporation should be deeded to petitioner and the corporation should be dissolved. After the dissolution of the corporation petitioner carried on substantially as he had for the preceding twelve years. The operations during the ensuing 2 1/2 years were so profitable that all of the advancements made by him to or on behalf of the enterprise were *276 liquidated. In petitioner's income tax return for the year 1941 he deducted $3,400 as a net long-term capital loss (one-half of the net long term capital loss of the community). Appended to the return is a lengthy statement explaining that petitioner felt at the time the return was made he had erred in deducting a loss in the same amount in his return for 1939. Some of the facts set out in the preceding paragraphs of these findings were shown in this statement and it was stated therein that petitioner had not realized, in 1939, that the corporation still had title to one of the orchards. In the notice of deficiency the Commissioner held that no loss had been sustained by petitioner in 1941, due to the worthlessness of the shares of Pacific Northwest Orchards Co. On December 1, 1941, petitioner paid $2,151 to the Guaranty Trust Co. This amount represented interest for the years 1939, 1940 and 1941 on a mortgage held by the trust company on the 80 acre orchard which the corporation deeded to petitioner on December 17, 1941. The amount was deducted by the community - i.e. one-half by each of the petitioners - as interest. The Commissioner disallowed the claimed deduction, holding *277 that the amount represented a capital expenditure, made in acquiring the property. He also held that, since the return was made on an accrual basis, "the item, if not a capital expenditure, should have been accrued prior to 1941." At all times from and after 1929 petitioner, Buckman and Hazen were engaged in a joint venture, managed by petitioner. The three tracts of land were owned by the joint venturers - 40 percentum by petitioner, 40 percentum by Buckman and 20 percentum by Hazen - and petitioner had an equitable lien upon the interests of his co-adventurers for the amounts advanced by him in the operation and development of the properties. Opinion The last finding is dispositive of both issues. Conclusion that no capital loss was sustained by petitioner in the taxable year follows and the disallowance of the claimed deduction for interest must be approved insofar as it involves the portion paid on behalf of Buckman and Hazen. Forty percentum of the amount paid, however, constitutes a proper deduction by the community under Section 23 (b), I.R.C.
It is usually difficult to rationalize completely a fact question. The present case is no exception. The *278 basic facts are shown in our findings. Petitioner, relying solely upon the formal liquidation of the corporation in 1941, claimed a loss equal to the amount alleged to have been invested in its stock. His theory seems to be that since the corporation distributed to him, as a creditor, its sole remaining asset - an 80 acre orchard - which it resolved did not have a value in excess of its indebtedness to him and immediately thereafter dissolved, distributing nothing to him as a stockholder, it follows that he sustained a loss equal to his stock investment. Respondent, relying upon the statements made in petitioner's returns and in the returns which he had signed in behalf of the corporation, concluded that the loss upon the stock, if any, had been sustained in an earlier year. Our conclusion, although espoused in toto by neither party, is, we think, justified and required by the record. The evidence, consisting almost entirely of petitioner's testimony and returns, documents, schedules, etc., prepared by him, is, to say the least, rather difficult to follow. No corporate records were produced and petitioner was vague and uncertain as to many of the details. The basic facts have been *279 shown in our findings. The conclusion, however, rests largely upon inferences drawn from petitioner's testimony. Petitioner, obviously an orchardist of ability and a good business man, in 1929 conceived the idea of expanding his operations. His experience had demonstrated that substantial profit could "be made in raising certain varieties of fruits, apples and pears, on certain kinds of land." He suggested to his cousin and his foreman, who had been associated with him for several years, that they join with him in developing a new pear orchard. "The varieties [to be planted] were selected as being the most profitable fruit varieties that * * * [petitioner] had had any experience with. The other two orchards [the 10 acre and 80 acre orchards] were purchased purely for the purpose of starting the development of that 80 acre tract" - i.e., the new pear orchard. Buckman and Hazen fell in with the plan. The sequence of events from this point on is not very clear. Although a corporation was organized, its part in carrying out the plan was negligible. We quote from petitioner's testimony. "We put in a total of $34,000 in cash. * * * Part of the purchase was on contract. Two tracts *280 we bought on contract, with payments to be made over ensuing years. A third property was paid for in cash, which we paid for out of the capital, partly, and partly by mortgage * * *." "* * * [The] depression started and our plans were upset and we went behind some. * * * [We] made unexpected losses, which I made up * * *. [In] 1936 prices came back. There was a little uplift in farm prices that year." "* * * [The] orchard tract that we set out in 1929 gradually ceased to be a liability from the standpoint of expense and became the most profitable of the three orchards." * * * "Sometimes we would come out nearly even, but I had to make up, of course." "* * * [Our] obligations [in 1938] amounted to about $20,000 [in addition to amounts owing to petitioner.]" Petitioner was never concerned about his ability to get back the amount which he had advanced; for he "had been in the [fruit] business for 32 years" and had "always known that there were periods when prices were lower and returns were correspondingly lower and periods when prices were higher and returns were very satisfactory." Buckman was "a cousin of mine and he was willing to do anything I wanted him to do. *281 He always left it up to me." "The third partner, Clyde C. Hazen, had never considered liquidating at that time [1938] and the property was then by verbal understanding left to me to operate on the basis of virtually rental * * *." Petitioner told his accountant in March 1939 to make up his income tax return. "I think I told him the company was going to liquidate. Later on, although he included our apparent intentions in my return, we changed our plan - I changed my mind rather - and we did not liquidate." "In 1941 we decided it best to liquidate the corporation and we went through the legal process of winding up the affairs of the company * * *." Thereafter partnership returns were filed, 40 percent of the income being included in petitioner's return, 40 percent in Buckman's return and 20 percent in Hazen's. The income in the later years was very substantial. Within two and one-half years all of the amount advanced by petitioner - about $65,000 - was repaid and "the result of the operations * * * showed enough net profit, over and above all operating expenses, to compel me to deed back to them [Hazen and Buckman] their interest." Looking realistically at the evidence we have *282 been impelled to hold that, in spite of the fact that some of the property was, for a time, in the name of a corporation which was organized in 1929, the essence of the transaction was that petitioner, Hazen and Buckman were at all times participants in a joint venture. Here, as in Mark A. Mayer, 36 B.T.A. 117, the corporation transacted no business of any kind, was a mere nominal titleholder, kept no records, had no bank account, held no meetings of stockholders or directors, was unconcerned whether it had any officers or not, and at no time functioned as a corporation. Its existence from the beginning was probably a handicap and was never taken seriously by anyone. When it was deemed advisable to take the title to two of the pieces of property which had been purchased under contract it was placed in the name of petitioner so that a mortgage acceptable to the Federal Land Bank could be executed. When the interested parties, in 1939, desired to avoid having the corporation account to the state for social security taxes they caused its personal property to be "taken over" by petitioner. Just how this was brought about is not clear; and it is difficult to see how a "verbal *283 understanding" could be reached between petitioner and a corporation of which he was president. Taxation, it has been said many times, is a practical matter and substance should control. United States v. Phellis, 257 U.S. 156. A practical, rather than a legal, test should be applied in determining whether a loss has been sustained. Lucas v. American Code Co., 280 U.S. 445. Cf. Eliot W. Mitchell, 37 B.T.A. 161; Frances M. Parkford, et al., 45 B.T.A. 461, affirmed Parkford v. Commissioner, 133 Fed. (2d) 249. Applying it here we are convinced that no real loss was sustained in 1941 merely because the corporation was dissolved. There are many circumstances in supporting this view. The record does not establish that any reduction in the alleged indebtedness to petitioner was made when, in 1935, land which cost $21,500 was deeded to him or when, in 1939, he "took over the personal property of the corporation. Moreover, by petitioner's own admissions, it is obvious that the property deeded to him in 1941 had a very substantial value. No effort was made to prove its value at that time; but it is significant that the earnings *284 from all of the properties were sufficient to liquidate, within two and one-half years, an "indebtedness" of more than $65,000. The interested parties obviously anticipated such an outcome; for they agreed that petitioner should hold the land in trust for his coadventurers and each, at the time of the trial, was receiving substantial income from it. Thus, looking realistically at the whole picture, it is clear no actual loss was sustained. It is true petitioner testified the agreement was made after the dissolution of the corporation. Assuming, for present purposes, that the statement accords with the fact, we are nevertheless of the opinion it merely superseded an earlier agreement to the same effect. Respondent committed no error in disallowing the claimed capital loss. Forty percentum of the amount paid in December of 1941 as interest will be allowed as a deduction by the community and Decision will be entered under Rule 50