## Morris SKLARSKY
v.

## The UNITED STATES.
### No. 49934.

United States Court of Claims.
July 12, 1957.

John R. Foley, Washington, D. C., for plaintiff. Paul J. Foley and James K. Foley, Washington, D. C., were on the briefs.

Philip R. Miller, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., Washington, D. C., for defendant. James P. Garland, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff sues to recover income taxes and interest thereon, collected from him for the years 1944, 1945, and 1946. During those years he was a member of two successive partnerships, in the first of which his wife and his son Danny, together with the widow of his deceased brother and two of her children were also partners, and in the second of which his wife and four of his sons were partners. This case is concerned only with the partnership relations of the plaintiff and his wife and sons.

The partnerships made substantial profits in the years in question, and various parts of those profits were reported by the plaintiff's wife and sons as their income. The Government's tax authorities took the position that all of the profits included in the wife's return and a large part of the profits included in the returns of the four sons should have been included, instead, in the plaintiff's own returns. If they had been, they would have been in brackets carrying higher tax rates.

The business carried on by the partnerships was that of manufacturing dolls, under the trade name Uneeda. The plaintiff Morris and his wife Jennie, before and after their marriage, worked in the toy industry. In 1918 they bought, with funds supplied largely by Jennie from savings and borrowings, a $2,500 interest in a doll and toy manufacturing firm, and went to work for that firm.

Morris' brother Benjamin had a doll factory, the Uneeda Doll Co. Benjamin invited Morris and Jennie to change their investment and employment to his firm and on Jennie's insistence they did so, in 1922, Morris receiving 25 percent of Uneeda's capital stock. Jennie was talented in designing and styling dolls and selecting materials for doll dresses, and her work contributed substantially to the large increase in the firm's business. In recognition of her services, Benjamin in 1925 transferred 15 percent more of the capital stock of Uneeda to Morris, so that thereafter Benjamin owned 60 percent and Morris 40 percent of the stock. Benjamin died in December 1942.

The corporation continued to carry on the business until it was dissolved at the end of 1943. At that time a limited partnership was formed, with Morris and Dora, the widow and administratrix of Benjamin, as general partners and two

daughters of Benjamin, and Jennie, and Danny, the eldest son of Morris and Jennie, as limited partners. The partnership had a capital of $100,000, each family having a combined share of $50,000. The partnership agreement stated the capital contributions of Morris, Jennie, and Danny to be $25,000, $10,000, and $15,000, respectively. The plaintiff says that before the dissolution of the corporation he had given some of his shares in it to Jennie and Danny, the number of shares to each being in substantially the proportions which their contributions to capital were stated to be in the partnership agreement. Whether he made the gifts of the corporate stock, or the gifts of shares in the partnership which now had the assets of the corporation, is not of vital importance. In Williamson v. United States, Ct.Cl., 152 F.Supp. 716, we have discussed the subject of gifts creating shares in family partnerships.

As to Jennie, at least, she well deserved to have a share in this dollmaking enterprise since her funds and initiative and talents had contributed largely to its success, and to the size of the share which Morris had in it.

The partnership agreement made careful provision for several ways in which the partnership might be terminated. Under these provisions, the equal interests of the families of Morris and Dora were each to be kept intact inside the respective family. The Dora interests agreed that upon termination or dissolution they would sell their interests to Morris at their book value, thus charging nothing for the name and goodwill of the enterprise.

There was no provision permitting a limited partner to withdraw his capital contribution. The agreement provided for distribution of profits to the partners, but it was tacitly understood that Danny would conserve his profits so as to provide the funds necessary for the eventual participation of his brothers, Bernard, Irwin, and Samuel in the business as partners.

The business made enormous profits in the year 1944, $327,350.97 on the stated capital of $100,000. The Government urges, in relation to this and the other years in question, that these profits prove that the capital represented by the shares of the limited partners contributed little to the profit-making capacity of the business; that the trade name, goodwill, and other intangibles were of great value and Morris, in the partnership agreement, retained the ownership of these by retaining the right to buy the shares of the limited partners on his side of the family for the book value of the assets other than these intangibles.

In September of 1944 Dora desired to withdraw $50,000 from the partnership funds for herself and her daughters. That was done, and at the same time the Morris family withdrew a similar amount, in checks of $25,000, $10,000, and $15,000 to Morris, Jennie, and Danny, respectively. All three of these checks were deposited in Morris' personal bank account. Danny was, at the time, in the military service in California. His $15,000 was, in accordance with the prior understanding which we have referred to above, used as a part of the capital contribution of his brothers, Bernard, and Samuel, to the succeeding partnership, which will be discussed in its turn. Jennie's $10,000 withdrawal was used by Morris with her consent as a part of the price for the purchase by the partnership of a corporation which owned the building in which the partnership business was carried on.

We think the income attributable to that proportion of the capital contribution of Danny to the 1944 partnership which was intended to be later used to pay for the shares of his brothers, Bernard and Samuel, was taxable to Morris. The gifts of shares in the partnership to the brothers were really to come from Morris, not from Danny, and until the gifts were completed the money belonged to Morris, though the checks were written to Danny.

In the autumn of 1944 Morris decided to terminate the partnership which included Dora and her family and form a partnership including only members of

his own family. Dora and her daughters were paid what they were entitled to under the 1944 partnership.

The new partnership was a limited partnership with Morris as the only general partner and Jennie, Danny, Bernard, and Samuel, and Morris as trustee for Irwin, as limited partners. Morris' capital contribution was stated as $40,000, Jennie's $20,000, and each of the others, $10,000, a total of $100,000. The agreement provided that, if the general partner so requested, the limited partners would have to contribute 50 percent of their profits to the capital of the partnership. It provided that no limited partner could assign his interest but that the general partner had the right, on thirty days' notice, to buy the interest of a limited partner.

The partnership commenced operations under this agreement as of January 1, 1945, and continued until March 2, 1946, at which time it was succeeded by a corporation, the stock in which was owned by Morris, Jennie, and the four sons. The instant suit involves only the period of the two partnerships. The 1945 partnership made large profits, as had the earlier one. The limited partners drew out little more than enough of their profits to pay their income taxes, leaving the rest to be added to their capital accounts.

Morris, the father, introduced his sons to the family business while they were mere children, by having them spend their time in and around the plant doing what chores they could. As they grew up they were often in the plant after school, on Saturdays, and during vacations. The eldest son Danny began in 1938 to work full-time for the firm, after partial completion of a college course. He worked in the production and selling departments and received a modest salary. He was inducted into the Army in 1941 and discharged in 1945. His Army service was in Texas and California. By letter and occasionally by telephone he was consulted about the family business, as he was well-versed in production problems. He was consulted about the 1944 and 1945 partnership agreements. Immediately on his discharge from the Army he returned to the factory and has been employed in the family business ever since.

Bernard finished high school in 1941. He worked for Uneeda for a few months, then worked in a defense plant for a year, then worked again for Uneeda. He became 18 in 1943 and was inducted into the Army, and discharged in 1946. His Army service was at Aberdeen, Maryland. When he had a weekend pass, he went to New York and on Saturdays painted dolls' heads and was paid the usual rate for it. Upon his discharge from the Army in 1946, he worked for Uneeda for a short time, then went to work for a chain of retail appliance, radio, and television stores, and continued in that employment until 1954. During those eight years he did no work for Uneeda. In 1954 his father told him that Uneeda needed a salesman, and he went to work for Uneeda for $12,500 per year.

Irwin went to college with the idea of going to medical school. Upon graduation from college he entered the Navy in 1943 and was released from active duty in 1946. Irwin had taken no interest in the business during his college vacations, and after his release from the Navy he informed his father that he had no interest in the business. He has had no relation to the business since that time and has had, apparently, no share in the successor corporation, because he has been supported by his father and listed by him on his income tax return as a dependent during several of the years following 1946.

Samuel finished high school in 1943, worked part-time at Uneeda for six months, went to college, became ill, worked occasionally at Uneeda while recuperating, went to college again, and in January 1945, left college and became a supervisor in the production department of Uneeda, where he has been employed ever since.

Our question is whether the partners in these two family partnerships "really

and truly intended to join together for the purpose of carrying on the business and sharing in the profits or losses or both". Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 741, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659. See Williamson v. United States, Ct.Cl., 152 F.Supp. 716.

Morris, the husband and father, very greatly desired that his sons interest themselves in and take part in the management of his thriving business. We have already discussed the situation of the wife, Jennie, and her interest in and contribution to the success of the business, which earned for her a share in it. As to the sons, two of them, Danny and Samuel, worked in the business from childhood, except for Danny's period of military service, and still work in it. It was entirely natural that they should want to have, and that their father should want them to have, a proprietary interest in this family business, so that they would share in its success or lack of success. As to the other two sons, Bernard and Irwin, no doubt their father's hopes for them were the same as for the other sons. In the case of Bernard, there was good reason for that hope, since he had shown much interest and industry in the enterprise. The fact that, after the termination of the partnership here in question, he went to work for another employer, is no evidence of the intention of the parties in the period here in question. As to Irwin, it would have been invidious to have omitted him from the 1945 partnership while he was in the Navy, although he had never shown any interest in the business and was not, apparently, temperamentally suited for a business career.

The Sklarsky family was well-suited to a patriarchal kind of family business, in which several, or all who desired, would take part. The business owned by the father was the kind of relatively small business in which any of the sons who was willing to work could fill a useful place and promote the success of the business more than could unrelated employees. The sons were not taken into the business as mere children, as they might have been if the principal aim of the father had been the avoidance of taxes. Before they were given proprietary interests in the business, they were paid only ordinary compensation for their work for it.

The fact that the sons left their profits in the business, rather than withdrawing them and spending them elsewhere, does not seem unnatural to us. Their interest in the business, and their hope for further profit from it, as well as their willingness to comply with the wishes of their father, would explain that. Their rallying to the aid of their father, when he was faced with a large income tax deficit, the deficit being based upon the Government's contention that the profits credited to the sons belonged, in fact, to the father, was what any father would hope for from his sons.

The Government's contention, noted above, that the trade name and goodwill of the business, which were kept within the control of the father, and the father's skill and initiative as the principal executive of the business, generated a larger share of the profits than the father's capital account attributed to him, is probably well-founded. If it were our function, or that of the Commissioner of Internal Revenue, to reform the partnership agreements so that they would more exactly attribute income to the partners on the basis of the profit-making capacity of their contributions of capital or services, this might well be a suitable case for doing that. But the function of the Commissioner of Internal Revenue, and of ourselves, is much more limited. It is only to determine, from all the evidence, whether these were real partnerships, or only pretended ones.

The Commissioner of this court has furnished to the parties and the court an able, careful and accurate report, distilled from a long transcript of testimony and a large number of exhibits. The brief of counsel for the plaintiff contains offensive and ill-mannered language with regard to that report. No public official

who has the responsibility of deciding disputed questions should be subjected to that kind of language. If it were not for the undeserved delay and expense which would have been caused the client, we would have rejected the brief and required the substitution of an expurgated one.

We conclude that in 1944 there was a valid family partnership composed of Morris as general partner and Jennie and Danny as limited partners and that the income attributed to Jennie and Danny which the Government redistributed to Morris alone is taxable to the respective limited partners, except for the income attributable to the $15,000 which Morris allegedly held for Danny and which was to be used for the capital contribution of Bernard and Samuel in the succeeding partnership, which amount is taxable to Morris.

There was a valid family partnership in 1945–1946 between Morris as general partner and Jennie, Danny, Bernard, Samuel, and Irwin as limited partners. Therefore, the income attributed to these limited partners which the Government reallocated to Morris is properly taxable to the respective limited partners.

The plaintiff is entitled to recover in accordance with this opinion and judgment is entered to that effect with interest thereon as provided by law. The amount of recovery will be determined by further proceedings under our Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.