Joe R. RAMOS and Mary Ramos,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 40033, 40202.

United States District Court
N. D. California, S. D.

June 22, 1966.

**480**

Jasper C. DeDobbeleer, Jerome A. Duffy, San Rafael, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., Richard L. Carico, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

The instant cases were brought by the plaintiffs, Joe R. and Mary Ramos, under Section 1346(a)(1) of Title 28, United States Code, to obtain refunds of federal income tax and interest which they allegedly overpaid. In Civil Action No. 40202, the plaintiffs seek to recover tax and interest totaling $66,797.77, paid for the calendar year 1956, plus interest allowed thereon by law. In Civil Action No. 40033, they seek to recover tax and interest totaling $55,182.04, paid for the calendar year 1957, plus interest allowed thereon by law. These cases were consolidated for trial and tried to the Court sitting without a jury.

The issues of fact and of law as framed by the pretrial order of these consolidated cases and as approved by plaintiffs and defendant are as follows:

A. ULTIMATE ISSUES OF FACT:

(1) Whether or not a valid family partnership composed of the plaintiffs and their children, Dolores Donaldson and Joe S. Ramos, was in existence and conducted and operated during the calendar year 1956 in connection with orchard and farming activities on the "Ramos Home Ranch."

(2) Whether or not a valid family partnership composed of Joe R. Ramos and his children, Dolores Donaldson and Joe S. Ramos, was in existence and conducted and operated during the calendar year 1957 in connection with orchard and farming activities on the "Ramos Home Ranch".

B. ISSUES OF LAW:

(1) If the Court finds that a valid family partnership was in existence during the calendar year 1956, was the sum of $70,640.48 received in that year from crops sold during the calendar

year 1955 (at a time when there was no partnership) taxable to the members of the 1956 partnership or to the plaintiffs.

(2) If the Court finds that a valid family partnership was in existence during the calendar year 1957, was the sum of $157,088.71 received in that year from crops sold during the calendar year 1956 taxable to the members of the 1957 partnership or to the members of the 1956 partnership (assuming that the Court finds that a valid family partnership was in existence for the calendar year 1956) or the plaintiffs (assuming that the Court finds that no valid family partnership was in existence for the calendar year 1956).

Additional questions which must be resolved as they relate to the amount of refund to which plaintiffs may be entitled are:

(1) If a partnership is found for 1956, must the corrected income thereof be adjusted to provide for the elimination of deductions for depreciation and property taxes.

(2) If a partnership is found for 1956, must the corrected income thereof be reallocated to credit plaintiffs with a reasonable salary for services rendered by plaintiff Joe R. Ramos.

(3) If a partnership is found for 1956, must the corrected income thereof be reallocated to credit plaintiffs with the reasonable rental value of the land, trees and equipment used in the production and harvesting of their crops during this year.[1]

(4) Did the absence of Joe S. Ramos in 1956 and for nine months of 1957 due to military service[2] affect the distributive share of the partnership income to which he would have been entitled but for such absence.

(5) If a partnership is found for 1957, must the corrected income thereof be reallocated to credit plaintiffs with a reasonable salary for services rendered by the plaintiff Joe R. Ramos.

Plaintiffs were credited with the reasonable rental value of the land, trees and equipment for 1957 (25% of the crop income), hence, subject to such adjustment as must be and will be hereinafter made because the partnership operated on a cash basis, no problem of reallocation of this item for this year arises.

The Court's answers to the issues of fact and law framed by the pre-trial order and the above additional questions, for the reasons hereinafter stated, are:

(1) A valid family partnership composed of plaintiffs, Joe R. and Mary Ramos, and their children, Dolores Donaldson and Joe S. Ramos, was in existence and conducted and operated during the calendar year 1956 in connection with almond orchard and farming activities on the "Ramos Home Ranch".

(2) A valid family partnership composed of Joe R. Ramos and his children, Dolores Donaldson and Joe S. Ramos, was in existence and conducted and operated during the calendar year 1957 in connection with almond orchard and farming activities on the "Ramos Home Ranch".

---

1. The alternative to a correction of the 1956 partnership income by a reallocation of the credit due plaintiffs for the reasonable rental value of the land, trees and equipment would be a reallocation of the credit due plaintiffs as a return on their capital. In the circumstances of this case, since neither the land, trees or equipment ever became partnership assets and all that the partnership received was the use thereof, such use may be more appropriately treated and described as a rental (as was the case

for the calendar year 1957) and is so treated for the purposes of these proceedings.

2. Section 704(e) (2) of the Internal Revenue Code of 1954 [26 U.S.C. 1958 ed. Sec. 704(e) (2)] provides in part: "The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service." An identical provision appeared in Section 191 of the Internal Revenue Code of 1939 (26 U.S.C. 1952 ed. Sec. 191).

(3) The sum of $70,640.48 received in the year 1956 from crops sold during the calendar year 1955[3] was taxable to the plaintiffs.

(4) The sum of $157,088.71 received in 1957 from crops sold during the calendar year 1956 was taxable to each of the members of the 1956 partnership in equal shares.

(5) The corrected income of the partnership for 1956 must be adjusted to provide for the elimination of deductions for depreciation and property taxes in the sum of $9,623.68 (depreciation $7,596.88 and taxes $2,026.80).

(6) The corrected income of the partnership for 1956 must be reallocated to credit plaintiffs with a reasonable salary for services rendered by plaintiff, Joe R. Ramos, which the Court finds to be and fixes in the sum of $4,200.00 ($350.00 times twelve months).

(7) The corrected income of the partnership for 1956 must be reallocated to credit plaintiffs with the reasonable rental value of the land, trees and equipment used in the production and harvesting of their crops during this year, which the Court finds to be and fixes in the sum of $55,160.12 (25% of the crop income of $220,640.48).

(8) The absence of Joe S. Ramos in 1956 and for nine months in 1957 due to military service did not in any way affect the distributive share of the partnership income to which he would have been entitled but for such absence.

(9) The corrected income of the partnership for 1957 must be reallocated to credit plaintiffs with a reasonable salary for services rendered by the plaintiff, Joe R. Ramos, which the Court finds to be and fixes in the sum of $3,150.00 ($350.00 times nine months).

A further adjustment must be made on the rental value of the land, trees and equipment for 1957. Such adjustment, based upon the fact that the partnership operated on a cash basis and based upon the books of the corporation, reflects the need to correct the partnership income for 1957 by a deduction in rental of $11,240.67. (This deducted amount of rental was actually paid in 1958 and not 1957.)

The foregoing answers and the adjustment of rental for 1957 are amply supported by the record.

■ The documentary evidence offered and received in evidence, the testimony adduced and the stipulations entered into show no substantial factual conflict. The record in these cases presents matters of law arising from what is in practical effect an agreed statement of facts (Tr. 215). All of the evidence in the case, oral and documentary, save and except Government's Exhibit "A" was presented by plaintiffs. At the Government's request, all witnesses were excluded from the courtroom during the taking of testimony. At the conclusion of plaintiffs' case, the Government rested and did not offer any evidence either by way of oral or further documentary evidence. In this connection it should be noted that the farming and business activities of the partnership, as well as the acts and conduct, both business and personal, of the individuals involved, had been under close scrutiny and continuous investigation of government tax agents and investigators since December 1958 (Pltfs! Ex. 50). Also of significance is the government's frank and open concession that the testimony of the four witnesses, Ruben Lopez (Tr. 367–373), Charles Huff (Tr. 373–379), Frank Molina (Tr. 379–383) and Sam Silva (Tr. 383–390) as to their knowledge of the formation, conduct and existence of the 1956 family partnership "is fairly truthful" (Tr. 390a). The weight to be accorded such a record is well expressed in Nicholas v. Davis, 10 Cir., 204 F.2d 200, 202 (a tax refund case), wherein, in con-

3. Although the family partnership was formed in about June of 1955, and the son, Joe S. Ramos, worked in the preparation of the land for 1956 and in the harvest of the 1955 crop, the family partnership was not to commence operation until January 1, 1956.

nection with a similar record, the Court said:

> When controlling, positive, and uncontradicted evidence is introduced, and when it is unimpeached by cross-examination or otherwise, is not inherently improper, and no circumstance reflected on the record casts doubt on its verity, then under the principles laid down in Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 215–220, 51 S.Ct. 453, 75 L.Ed. 983, it may not be disregarded even though adduced from interested witnesses, and no question of credibility or issue of fact is presented for determination by the jury.

See also: Alabama Title & Trust Co. v. Millsap, 5 Cir., 71 F.2d 518, 520; S. F. Ass'n for Blind v. Industrial Aid, etc., 8 Cir., 152 F.2d 532, 536.

*The Partnership Background.*

█ Joe R. Ramos was born in Spain and came to the United States just before his sixteenth birthday in 1925. He was not a man of formal education. His total schooling in Spain was five months and in the United States it consisted of about one month's study in preparation of his application for citizenship, which was granted to him in 1950 or 1951. In 1931 he married the plaintiff Mary Ramos at Auburn, California. Both of their children were born in Loomis, California; their daughter, Dolores Donaldson, on November 15, 1931, and their son, Joe S. Ramos, on September 17, 1934.

Joe R. Ramos had farmed on his own account in California since 1932, and prior thereto had worked as a ranch hand for others. In 1943 he purchased a 219 acre almond ranch at Winters, California, where he established the family at what became known as the "Ramos Home Ranch". At this time Dolores was about twelve and one-half years of age and Joe S. Ramos was about nine years of age. Throughout all their school years the children worked on the ranch. As they progressed in years, maturity and ability, they were responsible for and took on more and more of an active participation in the various ramifications of farming crops in and about the ranch (Tr. 10). While Dolores was in high school she began to learn bookkeeping in connection with the books of account and records of the ranch (Tr. 11). She was tutored in this work by Mr. Beverly Laugenour, the certified public accountant, who for many years was in charge of the books of account and responsible for the tax returns of Mr. and Mrs. Ramos (Tr. 11). Her brother, Joe S. Ramos, was carefully trained by his father in preparation for his eventual work as the "outside partner". Young Ramos' many years of apprenticeship were not confined to mere menial farm chores. To the contrary, he was meticulously and patiently instructed and trained by his father in all aspects of almond ranching, including the planting, shaping and cutting of trees (Tr. 421), spraying and pruning of trees (Tr. 421), contouring of land, placing of markers to indicate direction of levees (Tr. 423), pollenization (Tr. 423), and the hiring and recruiting of field workers (Tr. 27), including a trip to Mexico for such specific purpose (Tr. 372). This latter activity, bearing in mind young Ramos' knowledge of Spanish, was one of the most important aspects of the operation of the ranch because it had to do with the actual harvest of the crops. This training and work of his children was in preparation of and had for its definite objective the fulfillment of the clear intention, understanding and avowed purpose of Joe R. and Mary Ramos that when their son, Joe S. Ramos, reached his twenty-first birthday, a family partnership composed of all members of the family, would come into being (Tr. 19, 145, 154, 421, 426–427). This idea and purpose was acted upon as early as 1946, when Joe R. Ramos sought the advice of their then attorney, Mr. Ford of Colusa County, as to the wisdom and propriety of forming a family partnership with his wife and children (Tr. 13).

It is not open to question that on numerous occasions the subject of a family

partnership was discussed by and among members of the family, and that these discussions became more numerous and pointed as Joe S. Ramos approached his twenty-first birthday. It cannot be disputed that the finalizing of the agreement to form the partnership actually took place about the time Joe S. Ramos graduated from Sacramento Junior College in June 1955, and that immediately after graduation he went to work on a full-time basis at the home ranch in connection with the 1955 crop. Because of his draft status, and his status in the Naval Reserve, he entered the United States Navy, but deferred doing so until November 1955, at a time when the 1955 crop had been fully harvested (Tr. 23).

The plain and legitimate inferences which may properly be indulged in and drawn from the record in this case are that the Ramos family is an affectionate, close-knit, loyal and harmonious family, in which the virtues of filial respect, obedience and industry are the daily way of life; where the good things of life are worked for, nurtured and preserved for their enjoyment and natural passage from the parents to the children; "eventually that some day they would take over the complete management themselves, the children". (Tr. 515)

As authority for its resolution of the ultimate facts as to the existence and operation of valid family partnerships for the years in question, this Court relies upon the principles enunciated in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, 1661, decided in 1949. The yardstick by which the trial court is to measure the "family" partnership is set forth at page 742 of the Chief Justice's opinion, 69 S.Ct. at page 1214, wherein he declared:

The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard *supposedly* established by the Tower [Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670] case, but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on *their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.* (emphasis supplied)

Again, at page 744, 69 S.Ct. at page 1215 the Chief Justice went on to declare:

Unquestionably a court's determination that the services contributed by a partner are not "vital" and that he has not participated in "management and control of the business" or contributed "original capital" has the effect of placing a heavy burden on the taxpayer to show the bona fide intent of the parties to join together as partners. But such a determination is not conclusive, and that is the vice in the "tests" adopted by the Tax Court. It assumes that there is no room for an honest difference of opinion as to whether the services or capital furnished by the alleged partner are of sufficient importance to justify his inclusion in the partnership. *If*, upon a consideration of all the facts, *it is found that the partners joined together in good faith to conduct a business, having agreed that the services or capital to be contributed presently by each is of such value to the partnership that the contributor should participate in the distribution of profits, that is sufficient.* The Tower case did not purport to authorize the Tax Court to substitute its judgment for that of the parties; it simply furnished some guides to the determination of their true intent. (emphasis supplied)

The record in the instant case amply meets the test laid down by the *Culbertson* case. In the words of the Supreme

Court, "There is nothing new or particularly difficult about such a test."

If, on the instant record, the Court were to conclude that there was no true partnership in existence and operating during the years involved, it would be substituting its judgment for that of the parties. This record does not reflect "a misuse of the outward form of a partnership as a device for the obtaining of tax advantages". This Court finds that the parties, without thought of tax advantage, in fulfillment of a long-nurtured and oft expressed desire "in good faith and acting for a business purpose" and a "community of interest in the profits and losses", joined together in the conduct of the almond orchard and farming activities of the Ramos Home Ranch. *This was their true intention* and the history of the partners in their actual operations during the last six months of 1955 and throughout 1956 and 1957 bears this out.

*The 1956 Partnership.*

■ The expressed intention of the parties to form a family partnership, although not to be operative until January 1, 1956, came into existence, as the parties intended for years, on September 17, 1955, which was the twenty-first birthday of the son, Joe S. Ramos. It was given meaning and expression as early as June of 1955 when young Ramos graduated from Sacramento Junior College. From the day of his graduation and until November of that year, when he enlisted in the Navy, young Ramos, with knowledge of the family partnership to be formed and formed on his twenty-first birthday and in preparation and anticipation of its operative effect on January 1, 1956, worked continuously on the ranch to complete the harvest and prepare for 1956 by fertilizing and spraying. His sister, Dolores, contributed her services as bookkeeper throughout 1955 and continuously thereafter in 1956 and 1957. The fact that she was also employed by the Pacific Gas and Electric Company did not detract in any way from her capacity to properly keep the books and records of the ranch, nor

did it prevent her from enjoying the status of a partner. It is a fair statement from the record that no partner worked "full time". This was necessarily so because the business was a seasonal business in many respects. Joe R. Ramos, the father, did not devote his entire time and attention to the ranch, but was engaged in other pursuits, business ventures other than the partnership.

■ The basic concept of a partnership is a group of persons having a common business interest, working together in their respective spheres toward the successful operation and conduct of that business interest. It does not connote the idea that each and every working partner must punch a clock at eight o'clock in the morning and work continuously through the day until five o'clock. Dolores devoted her energies, skill and ability toward the paper work of the partnership in all that was required of her and thereby fully performed her responsibility to the partnership. Young Ramos, after doing all he could to complete the 1955 harvest and to prepare for 1956, went into the Navy and thereafter continued to do everything he could within the limits of military service by keeping abreast of ranch affairs, giving advice on farming matters, expressing his concern over ranch operations and by working on the ranch during some of the days of his Christmas furlough. In 1957 he worked continuously on the ranch from the date of his discharge from the Navy on October 4, 1957 to the end of the year. In speaking of the arrangement with his father at the time of his enlistment, he said: "It was an understanding we had, that I had with my father, that he would take care of things while I was gone and when I came back, I would make it up, and then he could take it easy." (Tr. 464–465).

■ Under the circumstances of this case wherein the partnership, pursuant to an oft expressed intention over the years, was created on September 17, 1955, even though not operative until January 1, 1956, the military service of

young Ramos did not foreclose, was not intended to foreclose, and statutorily (26 U.S.C., 1958 ed., Section 704(e) (2)) could not foreclose his right to a distributive share of the partnership earnings. See: Culbertson v. C. I. R., 5 Cir., 168 F.2d 979; Seabrook v. C. I. R., 5 Cir., 196 F.2d 322; Crossley v. Campbell, D.C., 87 F.Supp. 862; Anderson v. Robinson, D.C., 115 F.Supp. 776; Sklarsky v. United States, 153 F.Supp. 796, 139 Ct.Cl. 395, cases which are in accord with the conclusion reached by this Court, though the specific principle relating to absence because of military service was not discussed.

In reaching its conclusion this Court is not unmindful of the Government's reliance on the case of Cain v. United States, 135 F.Supp. 516, 133 Ct.Cl. 188. However, there are three significant facts in the *Cain* case which distinguish it from Ramos:

(1) That at the time of the Cain partnership young Cain had *already* received a commission as a probationary naval ensign *while still in dentistry school,* and prior to the signing of the agreement;

(2) That the partnership agreement took the precaution to provide that should the son die during his period of service all the property of the partnership would immediately revert to the father. This in the face of the fact that at the time of the agreement young Cain was married. This indicates a lack of control of the son over his interest in the partnership because the fact of death would completely cut out his wife and all property would revert to the father;

(3) That the *Cain* case involved a partnership of a *strictly personal* service character.

Contrary to *Cain*, we have *Culbertson*, and the situation respecting the four Culbertson sons, whose partnership status was contested. The oldest son was twenty-four years of age, married, and living on the ranch, of which he had for two years been foreman under the Coon and Culbertson partnership. He was a college graduate and received $100.00 a month plus board and lodging for himself and his wife, both before and after the formation of Culbertson & Sons and until entering the Army. The second son was twenty-two years of age, was married and finished college in 1940, the first year during which the new partnership operated. He went directly into the Army following graduation *and rendered no services to the partnership.* The two younger sons who were eighteen and sixteen years of age, respectively, in 1940, went to school during the winter and worked on the ranch during the summer. In a concurring opinion in *Culbertson*, Mr. Justice Burton at page 749 of 337 U.S., at page 1217 of 69 S.Ct. states:

\* \* \* The physical absence of some of the Culbertson boys from the ranch does not necessarily preclude them or others from the obligations or the benefits of the partnership for tax purposes. Their contributions of capital, their participation in the income *and their commitments to return to the ranch or otherwise to render service to the partnership are among the material factors to be considered. A present commitment to render future services to a partnership is in itself a material consideration to be weighed with all other material considerations for the purpose of taxation as well as for other partnership purposes.* (emphasis supplied)

The fact that the negotiations leading up to the 1956 partnership, and the partnership agreement itself, were oral, did not militate against the existence of the partnership, for as Joe R. Ramos expressed it, " \* \* \* we understand we don't have to have papers between the family." (Tr. 69) During this particular year the partners had not received any advice as to the formation of their business partnership and did not for a moment believe that there was any impropriety in continuing the business in the name of the father alone. As Mr. Laugenour, their then accountant, put it, "Although aware that a family partnership would be formed when the son, Joe S. Ramos, and the daughter, Dolores,

were both of age, I took no technical interest in their discussions because there was in my opinion no action necessary to accomplish this relationship for the purpose of preparing income tax returns." (Pltfs. Ex. 89)

It is true that in 1956 no change had been made in the bookkeeping practices of the family, that, other than the use of the land, trees and equipment in what the Court deems to have been a rental, there was no actual capital contribution, and separate partnership accounts were not maintained, yet there was no question as to the partnership and the nature thereof. This was expressed in the testimony of Dolores Donaldson, when she testified on cross-examination:

Q. Well, what was your twenty-five percent interest in 1956?

A. In the partnership agreement. When we formed it we were going to be partners, were going to be a family partnership, all together, and whatever income we made we would share.

If we had losses, we would share them and we would pay our expenses, and whatever was left we would share twenty-five percent, my father, my mother, my brother and I. I don't think you have to own land to have a share in anything.

Q. In other words, you feel you can participate in the profits from the land without owning any portion of the land?

A. Yes.

Q. And this is the type of partnership interest you had, just in the profits generated by assets?

A. Profits or losses that would be produced by the almond trees on the land. (Tr. 301–302)

Even though there was no bookkeeping separation of the partnership business from the rest of the family business, the books were adequate and clearly reflected what were to be considered as partnership items and what were to be considered as items personal to Joe R. and Mary S. Ramos. The business operations on the home ranch in connection with the almond crop were not of particular magnitude and did not involve the intricacies and complexities inherent in a big business. On the subject of bookkeeping records in connection with farming activities, it has been stated in Britt's Estate v. C. I. R., 5 Cir., 190 F.2d 946:

As to the bookkeeping records, farming is not a type of business in which elaborate records are usually kept. Nor are the members of a family, when dealing inter se, as likely to observe formalities as strictly as when dealing with others. Spurious agreements, designed to evade taxes, are frequently in better form than genuine ones. The records here kept were adequate and appropriate for the purpose, and present no evidence of distortion or concealment of facts.

This almond crop business, which was well suited to the Ramos family, was operated and carried out in the utmost good faith, in accordance with their partnership agreement, with each of the partners exercising dominion over the business in their respective spheres and participating in the earnings thereof in accordance with their respective interests. The partnership distributive shares were received and used and controlled by the partners with complete independence and have continued ever since to be so received, used and controlled. The 1956 partnership returns for both the federal and state governments were made in accordance with the agreement, and subject to adjustments hereinabove and hereinafter set forth, strictly and accurately reflected the distributive share of each partner.

*The 1957 Partnership.*

Without going into any greater detail than necessary, the record clearly reflects a valid formalized family partnership agreement betwee. Joe R. Ramos, Dolores Donaldson and Joe S. Ramos for the year 1957. Except for the formalization of the agreement and the fact that it was limited to Joe R. Ramos, Dolores Donaldson and Joe S. Ramos, the 1957 agreement was essentially the same

agreement that existed in 1956. The man instrumental in the formalization of the family agreement was Mr. Franzman, a certified public accountant, who in 1956 succeeded Mr. Laugenour as the family accountant. After reviewing with the family the entire family operation in 1956, he testified further at page 486 as follows:

Q. Yes, and do you know who was instrumental in having the change made?

A. Well, I guess I was.

Q. All right, tell us about that.

A. Well, one of the first questions I asked all the members of the family, whether there was a written partnership agreement on this, and I found out there was none, so I said, "Well, in my opinion, we should firm up this a little more. · It's fine what's in your hearts, yes, it's a partnership within your heart or the heart of each of you, but for legal purposes we probably should firm it up a little. Something might happen to you, might happen to Joey, Dolores—You don't know, you don't know what you might get involved in." So I suggested some type of a partnership agreement be drawn up.

Thereafter a partnership agreement was drawn up with each of the partners making an initial capital contribution of $15,000.00, for a total of $45,000.00. As the exhibits reflect, the partnership agreement was followed by such documents as Memorandum of Rent Agreement, Certificate of Transacting Business Under Fictitious Name of "Joe R. Ramos & Co.", Affidavit of Publication, together with the opening of partnership commercial and savings accounts and original books of account and bookkeeping records of Joe R. Ramos & Co. Without going into further detail, it can be said that the proof of the 1957 partnership is replete with indicia pointing to the fact that the producing, harvesting and sale of the 1957 almond crop was conducted as a family partnership enterprise. It is clear:

(1) That the partnership operations were conducted in accordance with recognized business practices and pursuant to the intent of the parties;

(2) That each of the partners made capital contributions of $15,000.00, and that these respective capital contributions were necessary to and were utilized by the partnership in connection with the 1957 operations;

(3) That the partners Joe R. Ramos and Dolores Donaldson each rendered services to the partnership in accordance with their previous understandings and agreements and did the work allocated to them; and

(4) That the partner Joe S. Ramos, by reason of his military service, was not able to be physically present in connection with the 1957 farming operation until his discharge on October 4, 1957, and that he then immediately went to the ranch, without any time off or vacation, and worked straight through to the end of the year. As heretofore stated, Joe S. Ramos was a partner, and his military service in no way served to diminish and was never intended to have the effect of diminishing his distributive share in the partnership earnings.

Having found a valid family partnership for 1956 and a valid family partnership for 1957, the Court, in determining the amount of overpayment, must now give consideration to the adjustments to be made to establish the corrected partnership income for each of these years and the manner in which the income should be allocated among the partners.

*The Reallocation of Receipts from Crops Sold in Prior Years, Depreciation and Property Taxes, Rental and Services of Joe R. Ramos.*

In 1956 the Ramos family partnership reported as part of its gross income the sum of $70,640.48 received for almonds raised on plaintiffs' ranch and sold in 1955 *before* the partnership was to become operative. Similarly, the partnership for 1957 reported as part of its gross income the sum of $157,088.71 received for almonds and peaches (the

receipts for peaches amounted to only $152.00) raised by the 1956 partnership in its operation and sold and delivered to the buyer in 1956. Although the plaintiffs and the partnerships for 1956 and 1957 were on a cash basis, the fact remains that the receipts in 1956 for crops raised in 1955 represented *earnings of the plaintiffs,* and the receipts in 1957 for crops raised in 1956 represented *earnings of the 1956 partnership.*

■ It is basic that income from services is taxable to the person who renders the services, and that income from property is taxed to the person who owns or controls the property. Moreover, this basic concept, which has been applied to Section 61 of the Internal Revenue Code of 1954 and similar provisions of prior revenue acts, cannot be defeated by a transfer or assignment before the income is realized. The $70,640.48 received in 1956 for crops sold in 1955 represented income earned exclusively by the plaintiffs and generated by their services and by property owned and controlled by them. The 1956 partnership contributed nothing to the earning or creation of this income. Similarly, the $157,088.71 received in 1957 for crops sold in 1956 represented income earned exclusively by the 1956 partnership and generated by services of and property controlled by the 1956 partnership. The 1957 partnership contributed nothing to the earning or creation of this income.

■ The plaintiffs, *having earned* $70,640.48 for crops sold in 1955, cannot defeat or avoid their tax liability by assignment to the 1956 partnership, and the 1956 partners, *having earned* $157,088.71 for crops sold in 1956, cannot defeat or avoid their tax liability therefor by assignment to the 1957 partnership. For cases in accord, see: Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940); Anthony's Estate v. Commis-

sioner of Internal Revenue, 155 F.2d 980 (10th Cir. 1946); Austin v. Commissioner of Internal Revenue, 161 F.2d 666 (6th Cir. 1947), cert. denied 332 U.S. 767, 68 S.Ct. 75, 92 L.Ed. 352; Palmer v. Commissioner of Internal Revenue, 267 F.2d 434 (9th Cir. 1959), cert. denied 361 U.S. 821, 80 S.Ct. 66, 4 L.Ed.2d 66; Williamson v. United States, 292 F.2d 524, 528, 155 Ct.Cl. 279 (1961).

■ It is evident that the 1956 partnership never owned the actual property upon which depreciation and property taxes deductions were claimed by the partnership in its 1956 returns. These deductions, amounting to $7,596.88 and $2,026.80, respectively, must be and are eliminated as deductions of the partnership and become personal expenses of the plaintiffs.

■ Salary allowances having been made to Dolores Donaldson for her actual services in 1956 and 1957 and to Joe S. Ramos for his actual services in the last three months of 1957, and the nature and quality of the services rendered by Joe R. Ramos in 1956 and for nine months of 1957 being at least comparable to those rendered by his son, the Court finds and directs that such reasonable salary allowances must be and are credited to Joe R. Ramos in the sum of $4,200.00 for 1956, and in the sum of $3,150.00 for nine months of 1957.

■ Finally, adjustments must be made in the rental of the land, trees and equipment used in the production and harvesting of the almond crops. As observed in Note 1 of this opinion, since all that the partnership received in 1956 from the plaintiffs was the use of the land, trees and equipment needed for the almond orchard operation, such use should be and is treated as a rental rather than a capital contribution, and the reasonable value thereof, as expressed in the 1957 agreement, is twenty-five percent of the crop income. This Court now, therefore, finds and fixes such rental for the year 1956 in the sum of $55,160.17 (twenty-five percent of the crop income for 1956 in the sum of

$220,640.48). For the year 1957, as previously stated in this opinion, the corrected partnership income should show a deduction in rental for that year in the sum of $11,240.67.

Consonant with its rulings and findings, the Court now sets forth what it deems to be appropriate schedules reflecting the corrected income of the partnerships for 1956 and 1957.

### 1956

The corrected partnership income for 1956 is $161,787.12. This amount has been determined as follows:

Receipts:

| | | |
|---|---|---|
| From 1955 crops | | $ 70,640.48 |
| From 1956 crops | | 150,000.00 |
| Receipts per 1956 tax return | | $220,640.48 |

Expenses:

| | | |
|---|---|---|
| Expenses per 1956 tax return | $68,477.04 | |
| Deduct depreciation | (7,596.88) | |
| Deduct property taxes | (2,026.80) | 58,853.36 |
| Corrected income for 1956 | | $161,787.12 |

---

To accord with the views previously expressed by the Court, this corrected income should be allocated to Joe R. and Mary Ramos and their children as follows in computing the judgment herein:

Joe R. and Mary Ramos:

| | | |
|---|---|---|
| Receipts from 1955 crops | $70,640.48 | |
| Rent (25% of 1956 receipts) | 55,160.12 | |
| 12 months' salary ($350.00 per month) | 4,200.00 | |
| 50% of unallocated balance | 14,993.26 | $144,993.86 |

Joe S. Ramos:

| | | |
|---|---|---|
| 25% of unallocated balance | | 7,496.63 |

Dolores Donaldson:

| | | |
|---|---|---|
| 25% of unallocated balance | $ 7,496.63 | |
| 12 months' salary ($150.00 per month) | 1,800.00 | 9,296.63 |
| Total | | $161,787.12 |

---

In computing the judgment, Joe R. and Mary Ramos would also be entitled to a deduction from their distributive share of 1956 income for depreciation

and property taxes of $9,623.68, which were eliminated in correcting the partnership income for that year. These were personal expenses of the plaintiffs, since the assets remained their property.

### 1957

The corrected partnership income for 1957 is $114,972.46. This amount has been determined as follows:

Receipts:

| | | |
|---|---:|---:|
| From 1956 crops (almonds and peaches) | | $157,088.71 |
| From 1957 crops and other sources | | 37,117.74 |
| Receipts for 1957 tax return | | $194,206.45 |

Expenses:

| | | |
|---|---:|---:|
| Expenses per 1957 tax return | $91,524.66 | |
| Deduct rent paid in 1958 | (11,240.67) | |
| Deduct Joe S. Ramos drawing for 3 months | (1,050.00) | 79,233.99 |
| Corrected income for 1957 | | $114,972.46 |

As with 1956, this corrected income should be allocated to Joe R. and Mary Ramos and their children as follows in computing the judgment:

Joe R. and Mary Ramos:

| | | |
|---|---:|---:|
| 50% of 1956 crop receipts (almonds only, with adjustment of $152.00 for peach crop) | $78,468.35 | |
| 9 months' salary ($350.00 per month) | 3,150.00 | |
| 33⅓% of deficit balance | (15,988.09) | $ 65,630.26 |

Joe S. Ramos:

| | | |
|---|---:|---:|
| 25% of 1956 crop receipts (almonds) | $39,234.18 | |
| 3 months' salary ($350.00 per month) | 1,050.00 | |
| 33⅓% of deficit balance | (15,988.08) | 24,296.10 |

Dolores Donaldson:

| | | |
|---|---:|---:|
| 25% of 1956 crop receipts (almonds) | $39,234.18 | |
| 12 months' salary ($150.00 per month) | 1,800.00 | |
| 33⅓% of deficit balance | (15,988.08) | 25,046.10 |
| Total | | $114,972.46 |

In computing the judgment herein, plaintiffs should also adjust their rental income from Joe R. Ramos & Co. to eliminate the rent paid in 1958.

This opinion shall constitute the findings of fact and conclusions of law of the Court. Based thereon and the schedules above set forth, the parties are directed to compute the refunds due plaintiffs for the year 1956 and 1957 and submit an appropriate judgment to the Court.

## AMENDMENT TO MEMORANDUM OPINION AND ORDER

The Court, at the request of counsel, has reviewed the allocation of income for the 1956 partnership involved in the above actions. It appears that the Court used as the measure of rent for 1956 gross receipts of $220,640.48, whereas the correct partnership gross receipts for that year were only $150,000. The Court therefore modifies and amends its June 22, 1966 Memorandum Opinion and Order to find and fix as rental allocable to plaintiffs for 1956 the sum of $37,500 in lieu of the amount previously set forth.

In accordance with this amendment, the income for the 1956 partnership should be allocated as follows in computing the amount of the judgment to be entered herein:

| | | |
|---|---|---|
| Joe R. and Mary Ramos: | | |
| Receipts from 1955 crops | $70,640.48 | |
| Rent (25% of receipts from 1956 crops) | 37,500.00 | |
| 12 months' salary ($350.00 per month) | 4,200.00 | |
| 50% of unallocated balance | 23,823.32 | $136,163.80 |
| Joe S. Ramos: | | |
| 25% of unallocated balance | | 11,911.66 |
| Dolores Donaldson: | | |
| 12 months' salary ($150.00 per month) | $ 1,800.00 | |
| 25% of unallocated balance | 11,911.66 | 13,711.66 |
| Total | | $161,787.12 |

In computing the judgment, Joe R. and Mary Ramos would also be entitled to a deduction of $9,623.68 from their distributive share of 1956 partnership income for depreciation and property taxes which were eliminated in correcting that partnership income.

In all other respects, the Memorandum Opinion and Order entered herein on June 22, 1966 shall remain unchanged.