FRANCES M. PARKFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

E. A. PARKFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 96459, 102987.   Promulgated October 24, 1941.

*John C. Altman, Esq.,* and *Louis E. Goodman, Esq.,* for the petitioners.

*Samuel Taylor, Esq.,* for the respondent.

OPINION.

MELLOTT: Petitioners contend that the fair market value of the Universal shares, if income at all, became income when the right to receive them accrued to Parkford, which, they say, occurred in 1935 rather than 1936. They point out that all of the services had been rendered prior to the stockholders' meeting on December 23, 1935; argue that the corporation had "bound itself by the resolution, unconditionally, to deliver" the shares to Parkford; contend that his right to receive them then became absolute; and insist that the statement in the resolution to the effect that delivery to him was to be made "out of the 186,778 * * * and the 1,000 shares" was merely descriptive—a designation "of the place from which the shares were to come." We do not agree. While Parkford's services had been largely rendered in bringing about the agreement of November 19, 1935, it is clear that he was to receive nothing unless the corporation succeeded in acquiring the stock. Even then he was more or less dependent upon the munificence of the corporation; for his contract was only with Starr. When it became probable that the corporation would secure the possession of the stock the Universal stockholders then authorized 9,000 shares to be turned over to Parkford, 8,000 to the attorney and 12,675 to Starr. The minutes of the corporation show that Starr had "explained that both contracts [with Parkford and the attorney] were entirely contingent and that the parties were to receive nothing in the event that they were unsuccessful and were to receive the number of shares specified only in the event that their efforts were successful." In our judgment the corporation had not "bound itself, unconditionally, to deliver the shares of Parkford" merely by adopting a resolution agreeing to deliver to him 9,000 shares "out of" the 186,778. It knew that it would have no shares to

deliver unless and until the court should approve the proposed settlement. The agreement contemplated and required that the receiver "endeavor diligently to secure the approval by" the court "and by such other persons, firms or corporations as the Court should deem necessary." The approval of the trustee was absolutely necessary; and it would agree only provided a modification of the proposals should be made and only then if the court should direct it to do so. The order of the court, therefore, was a necessary concomitant to securing the stock out of which petitioner, Starr and the attorneys were to be paid. The order was not entered until January 15, 1936. Then, and not until then, did petitioners' right to receive the stock "become fixed and unconditional." *H. Liebes & Co.* v. *Commissioner* (C. C. A., 9th Cir), 90 Fed. (2d) 932; *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290; *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. See also *Frost Lumber Industries, Inc.*, 44 B. T. A. 1249, and cases therein cited. The fair market value of the stock, in our opinion, then constituted income to petitioners and should have been accrued upon their books. That is apparently the view which they took; for they did not accrue it in 1935. While this is not controlling, *United States* v. *Anderson*, 269 U. S. 422; *Commissioner* v. *Union Pacific R. Co.*, 86 Fed. (2d) 637, it is at least an indication that they felt an "unconditional right to receive it" had not arisen in that year.

Petitioners place considerable reliance upon the testimony of the attorney for the minority stockholders, the gist of which was that a partial hearing was had before the court on December 23, 1935, at which time it was indicated approval of the plan would be granted, after which the stockholders repaired to the office of the company and held the series of meetings shown in our findings. Petitioners' contention seems to be that since the court indicated its willingness to approve the proposed plan—subject only to hearing upon the petition of the trustee-bank for instructions—the corporation was then willing to bind itself, unconditionally, to deliver the 9,000 shares to Parkford and Bering. We are of the opinion, however, that the testimony of this witness does not justify us in reaching such conclusion. The court records do not indicate that the court approved the proposed agreement on that date. They are the best evidence. Moreover, the minutes of the stockholders' meetings show that the corporation never intended to give the stock to Starr, Parkford, or the attorney unless it was received. Since the order of the court was not entered until January 15, 1936, and since petitioners' right to receive the stock did not become absolute until then, we are of the opinion, as stated above, that the fair market value of the stock on that date then accrued to them as income.

The facts with reference to the $7,500 are not seriously in dispute. Parkford had been employed to render services which would ultimately

entitle him to receive $15,000. Some of them were rendered before and some were rendered after the filing of the petition in bankruptcy. A compromise of the dispute between him and the trustee resulted in $7,500 being paid to each of them. The parties agree that it is impossible to allocate any particular portion of the fee to the services rendered before and to the services rendered after the adjudication. They also agree that the approval of the bankruptcy court to the compromise was valid. Respondent included the whole amount in petitioners' income upon the theory that the right to receive it accrued within the calendar year. Petitioners contend that "the right to receive the full sum of $15,000 never at any time accrued to Parkford, and since the amount of compensation payable to him was by order of court limited to $7,500, it follows that only $7,500 accrued to him and the action of respondent in treating the additional $7,500 as taxable income to Parkford cannot be justified upon any theory."

Petitioners argue that the right to receive the sum of $15,000 did not accrue to Parkford *prior* to the bankruptcy. We agree. *North American Oil Consolidated* v. *Burnet, supra.* But that is not determinative of the present controversy. The right to receive it did accrue during the year 1936. It resulted from services rendered by him. The services were completed and the money became available (except for the intervention of the trustee) on February 7, 1936. Does the fact that a petition in bankruptcy was then on file, that the receiver was claiming the fee, and that Parkford was shortly thereafter adjudicated a bankrupt prevent the fee from accruing to him? We think not.

Under the Bankruptcy Act (sec. 70 as amended; 11 U. S. C. A., sec. 110) the trustee of the estate of a bankrupt is "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition in bankruptcy    *    *    *" to all property of the bankrupt (except exempt property), "including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered    *    *    *." As to all property in the possession or under the control of the bankrupt at the date of bankruptcy or otherwise coming into the possession of the bankruptcy court, the trustee "shall be deemed vested as of the date of bankruptcy with all the rights, remedies and powers of a creditor then holding a lien thereon by legal or equitable proceedings    *    *    *; and as to all other property, the trustee shall be deemed vested as of the date of bankruptcy with all the rights, remedies and powers of a judgment creditor then holding an execution duly returned unsatisfied    *    *    *."

It has frequently been stated that a trustee in bankruptcy "stands in the shoes of the bankrupt" for most purposes. Cf. *Schultz* v. *England*, 106 Fed. (2d) 764. If the bankrupt could not have trans-

ferred the property at the time of the filing of the petition, or if it was not subject to seizure under judicial process at that time, then no title vested in the trustee. *In re Baxter*, 104 Fed. (2d) 318. Perhaps there is some substance to, or reason for, the "doubt" expressed by the respondent as to whether the trustee was entitled to any part of the $15,000; but that need give us no concern. If the trustee was entitled to the fee under the above section of the bankruptcy act, it was probably because it was "property" of the bankrupt. This would undoubtedly be true if he had done all that he was required to do prior to the bankruptcy in order to be entitled to the compensation. *In re Leibowitt*, 93 Fed. (2d) 333; certiorari denied, *Stein* v. *Leibowitt*, 303 U. S. 652. If, on the other hand, petitioner's right to receive the fee accrued to him after the bankruptcy and he voluntarily released a portion of it to the trustee, it is obvious that all of it must be included in his gross income.

Much that has been said with reference to the $15,000 fee is apposite to the $48,000 fee represented by the Universal stock. The last event entitling petitioners to receive this fee—approval of the contract by the court—occurred on January 15, 1936, nine days prior to the adjudication in bankruptcy. *In re Leibowitt, supra; Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11; *Edwards Drilling Co.*, 35 B. T. A. 341, and cases cited; affd., 95 Fed. (2d) 719. A "practical construction" of the taxing act would probably justify the inclusion in gross income of the assigned income, under the rationale of *Lucas* v. *Earl*, 281 U. S. 111; *Burnet* v. *Leininger*, 285 U. S. 136; *Helvering* v. *Horst*, 311 U. S. 112; *Helvering* v. *Eubank*, 311 U. S. 122; and *Harrison* v. *Schaffner*, 312 U. S. 579, even though it was an involuntary assignment. It is unnecessary to place our decision on this ground, however. The income should have been accrued upon petitioners' books when all of the events occurred entitling them to receive it. It is idle to contend it is inequitable to tax them upon it because they did not personally receive it. All of it was used to pay their debts, and, if equities were to be weighed, it would be far more inequitable to the fiscus to permit the income to escape taxation altogether. That would be the result if it is not included in petitioners' gross income.

Upon brief petitioners argue that a recent unpublished memorandum opinion of the Board, in which it was held that a lawyer who in an earlier year had assigned to one of his creditors his right to receive certain fees was not in receipt of income when the fee was paid to the assignee, supports their contention that they can not be taxed upon the income unless it is personally collected by them. The cited case does not hold, as petitioners upon brief state, "that an insolvent taxpayer is not chargeable with income where he does not have the use or enjoyment thereof but instead the income is paid directly to his creditors." It was pointed out in the cited case that

the effect of the loan in the earlier year was not before us. Our conclusion in the instant proceeding is not in conflict with the holding in the cited case. In addition it may be pointed out that, even if the holding in the cited case had been as set out in petitioners' brief, that could not aid them; for they in effect had "the use" of the income when their debts were paid with it. We are of the opinion and hold that both the $48,000 and the $7,500 must be included in petitioners' gross income for the year 1936.

Petitioners' final contention is that by reason of the seizure and permanent retention of all of Parkford's assets by the trustee in bankruptcy they sustained a deductible loss for the year 1936 in a sum far in excess of the entire net income determined by the respondent. They point out that the total cost of the property turned over to the trustee was approximately $609,000 and approved claims $793,000 and say: "* * * there obviously was no possible surplus remaining to go to the bankrupt and the difference between the total cash cost * * * and the total amount realized in the bankruptcy proceeding, far exceeded the net income for 1936 of Parkford * * * of $113,713.14. Such excess amounted to several hundred thousand dollars. It follows therefore that taxpayer had a loss, as a result of the seizure and retention of his assets * * * in an amount far in excess of the net income claimed to have been received by him, by respondent in his deficiency notice. That this is a proper deductible loss was held in *Stuart* v. *Commissioner*, 38 B. T. A. 1147."

The contention is fallacious. A casual reading of the cited case might indicate that such a holding was made; but the holding was: "* * * petitioner sustained a loss in 1934 as the result of acting as a director of the Guaranty Building & Loan Association. The loss sustained, in the amount of at least $12,621.06, is a legal deduction from gross income." The taxpayer had been sued and judgment had been rendered against him for more than $7,000,000. He filed a voluntary petition in bankruptcy and turned over all of his property to the trustee. It was pointed out that the judgment had been rendered against him "by reason of his having been a director and vice president of" the building association; that "This was a business undertaking * * * and the loss was one sustained in trade or business." Opinion was expressed "that the bankruptcy proceeding has nothing to do with the deductibility of the loss."

The *Stuart* decision, *supra*, is the only authority cited by petitioners in support of their contention. No statute or court decision under which any such alleged loss could be allowed is called to our attention and we know of none. The allowance of deductions " 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440." *Deputy* v. *DuPont*, 308

472

U. S. 488. Moreover it is difficult, if not impossible, to see how Parkford could have suffered a "loss" when, through the bankruptcy proceedings, he was discharged from liabilities greatly in excess of the actual cost—and basis—of the property which he turned over. Petitioners have not proved that they sustained any deductible loss.

Some evidence was introduced by petitioners in support of their charge that the respondent erred in denying a loss of $21,000 on 95 shares of the capital stock of the Kern County Realty Co. The contention was ultimately abandoned. We have accordingly refrained from making any findings of fact on this issue.

The deficiencies shall be recomputed, including in petitioners' income $55,500 instead of $82,500 as salaries and commissions, and

*Decision will be entered under Rule 50.*