STEPHEN B. SCHNEER AND NANCY K. SCHNEER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31804-88.      Filed December 12, 1991.

*Richard L. Gold,* for the petitioners.
*Andrew I. Ouslander,* for the respondent.

GERBER, *Judge:* Respondent, by means of separate notices of deficiency, determined deficiencies in Federal income

tax for petitioners' 1984 and 1985 taxable years in the amounts of $49,708 and $25,252, respectively. Respondent, in both years, also determined additions to tax under section 6653(a)(1)[1] and an additional 50-percent interest on $45,437 of the 1984 deficiency and on $25,252 of the 1985 deficiency under section 6653(a)(2). Respondent also determined additions to tax under section 6661 and increased interest under section 6621(c) for both taxable years. By agreement, the parties have resolved the additions to tax under section 6661 and increased interest under section 6621(c). The parties have also resolved the additions to tax under section 6653(a)(1) and (2) in connection with the adjustments concerning the Coal Venture II tax shelter for both taxable years. There remain for our consideration issues concerning: (1) Whether fees received from petitioner husband's prior law firm (where he was not a partner) are taxable to petitioner husband or the partners of his new law firm (where he is a partner); and (2) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) with respect to any portion of the deficiencies in income tax attributable to issue (1).

## FINDINGS OF FACT

The parties' stipulations of facts and referenced exhibits are incorporated herein by this reference.

Petitioners resided at Croton-On-Hudson, New York, at the time the petition was filed in this case. Stephen B. Schneer (hereinafter petitioner, when used in the singular, shall refer to Stephen B. Schneer), was a practicing attorney during the years 1983, 1984, and 1985. Until February 25, 1983, petitioner was an associate with the law firm of Ballon, Stoll & Itzler (BSI). BSI was a partnership. Petitioner was not a partner in BSI and he did not share in general partnership profits. Petitioner's financial arrangement with BSI consisted of a fixed or set salary and a percentage of any fees which arose from clients petitioner brought or referred to the firm.

---

[1]Section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years under consideration. Rule references are to this Court's Rules of Practice and Procedure.

BSI did not have a written partnership agreement, and no written agreement existed in connection with petitioner's relationship as an associate with BSI. When petitioner left BSI he had an understanding that he would continue to receive his percentage of fees which arose from clients he had referred when he was an associate with BSI. Petitioner was expected to consult regarding clients he referred to BSI and whose fees were to be shared by petitioner. Petitioner would have become entitled to his percentage of the fees even if he had not been called upon to consult.

After petitioner left BSI and while he was a partner of two other law partnerships (other than BSI) he consulted on numerous occasions concerning BSI clients. Most of the 1984 and 1985 fees received under this agreement were attributable to Terri Girl and Prince, clients that petitioner had brought to BSI. Neither the remaining BSI attorneys nor petitioner had contemplated whether petitioner would receive the fees if he refused to consult concerning the clients referred by petitioner. For the years under consideration, petitioner consulted with BSI attorneys on each occasion his services were requested. The services provided by petitioner to BSI consisted of legal advice and consultation on legal matters.

Late in February 1983, petitioner became a partner in the law firm of Bandler & Kass (B&K), and on August 1, 1985, petitioner became a partner in the law firm of Sylvor, Schneer, Gold & Morelli (SSG&M). BSI, B&K, SSG&M, and petitioner, at all pertinent times, kept their books and reported their income on the cash method of accounting. Neither B&K nor SSG&M had written partnership agreements. The agreement between the partners of B&K was that each partner would receive a percentage of the partnership profits derived from all fees received beginning the date the partner joined the partnership. In addition, petitioner agreed to turn over to the partnership all legal fees received after joining the partnership, regardless of whether the fees were earned in the partnership's name or from the partnership's contractual relationship with the client. The same agreement existed between the partners of SSG&M, including petitioner.

During 1984 and 1985, BSI remitted $21,329 and $10,585 to petitioner. The amounts represented petitioner's percentage of fees from BSI clients that he had referred to BSI at a time when he was an associate with BSI. With the exception of $1,250 for the 1984 taxable year, all of the fees received during 1984 and 1985 were for work performed after petitioner left BSI. Petitioner, pursuant to his agreements with B&K and SSG&M, turned those amounts over to the appropriate partnership. B&K and SSG&M, in turn, treated the amounts as partnership income which was distributed to each partner (including petitioner) according to the partner's percentage share of partnership profits.

BSI's 1984 records reflect that of the $21,329 total, $944 was attributable to Prince and $17,060 was attributable to Terri Girl. The remainder of the $21,329 remitted for 1984 ($3,325) was attributable to BSI clients for which petitioner had not consulted since leaving BSI during February 1983. The 1985 records of BSI reflect that the entire amount ($10,585) was attributable to Prince. BSI records reflect that billings and fees were made and received from BSI clients at various times during the year, but that petitioner received one annual aggregate payment.

## OPINION

We consider here basic principles of income taxation. There is agreement that the amounts paid to petitioner by his former employer-law firm are income in the year of receipt. The question is whether petitioner (individually) or the partners of petitioner's partnerships (including petitioner) should report the income in their respective shares.

The parties have couched the issue in terms of the anticipatory assignment-of-income principles. See *Lucas v. Earl*, 281 U.S. 111 (1930). Equally important to this case, however, is the viability of the principle that partners may pool their earnings and report partnership income in amounts different from their contribution to the pool. See sec. 704(a) and (b). The parties' arguments bring into focus potential conflict between these two principles and compel us to address both.

First, we examine the parties' arguments with respect to the assignment-of-income doctrine. Respondent argues that

petitioner earned the income in question before leaving BSI, despite the fact that petitioner did not receive that income until he was a partner in B&K and, later, SSG&M. According to respondent, by entering into partnership agreements requiring payment of all legal fees to his new partnerships, petitioner anticipatorily assigned to those partnerships the income earned but not yet received from BSI.

Respondent also raises the question of petitioner's method of accounting—the cash method. Respondent notes that the cash method requires taxpayers to postpone reporting income until received, whether or not earned prior to receipt. See secs. 1.446-1(c)(1), 1.451-1(a), Income Tax Regs. While the concepts of recognition, receipt, and accounting method are sometimes necessary for a complete analysis of an assignment-of-income case, respondent here appears primarily concerned with the possibility that petitioner's method of accounting will obscure our perception of when petitioner earned the income in question.[2]

Petitioner contends that the income in question was not earned until after he left BSI and joined B&K and SSG&M. He argues that the income received from BSI is reportable by the partners of the B&K and SSG&M partnerships (including petitioner) in their respective shares. Petitioner also points out that partnership agreements, which like the ones in issue allocate and redistribute partners' income, have received the approval of respondent in Rev. Rul. 64-90, 1964-1 C.B. (Part 1) 226. Petitioner argues that he was obligated to consult with BSI in order to be entitled to the BSI fees. Petitioner concedes that, for some of the income in question, no consultation was performed or requested. He emphasizes, however, that a substantial amount (about 90 percent) of the fees involved clients of BSI for whom consultation was performed. Finally, petitioner believes that his failure to consult would have resulted in loss of the fees.

The principle of assignment of income, in the context of Federal taxation, first arose in *Lucas v. Earl, supra,* where the Supreme Court, interpreting the Revenue Act of 1918, held that income from a husband-taxpayer's legal practice was taxable to him, even though he and his wife had

---

[2]The Supreme Court addressed respondent's concern in *Helvering v. Horst,* 311 U.S. 112, 116 (1940).

entered into a valid contract under State law to split all income earned by each of them. In so holding, Justice Holmes, speaking for the Court, stated:

There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. [281 U.S. at 114-115.]

From that pervasive and simply stated interpretation, a plethora of cases and learned studies have sprung forth. Early cases reflected the use of the assignment-of-income principle only with respect to income not yet earned. The theory behind those interpretations was that income not yet earned is controlled by the assignor, even if assigned to another. Such income is necessarily generated by services not yet performed. Because the assignor may refuse to perform services, he necessarily has control over income yet to be earned. See *Matchette v. Helvering,* 81 F.2d 73 (2d Cir. 1936); *Helvering v. Horst,* 311 U.S. 112, 118 (1940).[3] This early rationale left open the possibility of successful assignments, for tax purposes, of income already earned. That possibility was foreclosed in *Helvering v. Eubank,* 311 U.S. 122 (1940), where the Supreme Court held that income already earned would also fall within the assignment-of-income doctrine of *Lucas v. Earl, supra.*

Respondent contends that *Helvering v. Eubank, supra,* is controlling in this case because petitioner had already earned the income in question at the time he entered into the partnership agreements. In that case, the taxpayer was an insurance agent who switched jobs and then assigned the future renewal commissions from policies already written. The taxpayer had written the policies and completed all work on them before leaving that job. The renewals and commissions were realized by the taxpayer solely due to the initiative and action of policyholders. " 'At the time of assignment there was nothing contingent in the * * * [taxpayer's] right' " to collect the money. See *Helvering v. Eubank, supra* at 126 (McReynolds, J., dissenting and quoting the lower court at 110 F.2d 737, 738 (2d Cir. 1940)).

---

[3]See also discussion in 3 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, par. 75.2.1, p. 75-9 through 75-13 (1981).

In this case, petitioner was not entitled to the referral fees unless the work for the referred clients had been successfully completed. On the other hand, petitioner would be entitled to the fees if the work was completed or if at the time of the assignment there was nothing contingent in petitioner's right to collect his percentage of the fees. Additionally, the majority of the services had not been performed prior to petitioner's leaving BSI. In this regard services had been performed with respect to $1,250 prior to 1984. With respect to $3,325 of the $21,329 of fees received in 1984, petitioner did not consult and was not required to do anything subsequent to leaving BSI to be entitled to those fees. With respect to the remainder of the $21,329 for 1984 and all of the 1985 fees, petitioner was called upon to and did consult while he was a partner of B&K or SSG&M.

We must decide whether petitioner had earned the fees in question prior to assigning them to the B&K or the SSG&M partnerships. Although petitioner was on the cash method, the principles that control use of the cash method are not suited to this inquiry. For purposes of the assignment-of-income doctrine, it must be determined whether the income was earned prior to an assignment. The principles underlying the cash method do not focus upon when income is earned, the focus is upon when income is actually or constructively received. The accrual method, however, involves a question of when income is earned, rather than when it is received. We accordingly consider the principles underlying the accrual method for the purpose of determining whether petitioner had "earned" the income in question prior to the time he agreed to turn it over to the B&K or SSG&M partnerships.

Income is said to accrue where the right to receive it becomes fixed, that is when there is an enforceable liability. See, e.g., *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184-185 (1934); *Commissioner v. Hansen*, 360 U.S. 446, 463-464 (1959). This principle has evolved into a more specific test to determine whether income is includable under the accrual method—the all-events test. Under that test income is includable (earned) when: (1) All events have occurred which fix the right to receive the income, and (2)

the amount can be determined with reasonable accuracy. See sec. 1.451-1(a), Income Tax Regs.

To meet the requirements of the all-events test, there can be no substantial contingency to a taxpayer's right of receipt or as to the certainty of the amount to be received. Under the accrual method, income may not be subject to taxation at a time when payment remains subject to the discretion of the employer, *Kinkead v. Commissioner*, 35 T.C. 152, 155-156 (1960), or there is some other factor of uncertainty, *Commissioner v. Brown*, 54 F.2d 563, 567-568 (1st Cir. 1931). See also *Parkford v. Commissioner*, 45 B.T.A. 461 (1941), affd. 133 F.2d 249 (9th Cir. 1943); *Leedy-Glover Realty & Insurance Co. v. Commissioner*, 13 T.C. 95, 104-106 (1949), affd. per curiam on other grounds 184 F.2d 833 (5th Cir. 1950).

The transaction under consideration is one where petitioner had an agreement under which he would receive a percentage of fees received by BSI from clients who were referred by petitioner while he was an employee of BSI. Inherent in petitioner's unconditional right to payment is the condition precedent that billable services have been performed for the referred client. Additionally, petitioner's right to payment may also be subject to a second condition precedent that he may be required to consult and be involved in performing the services to be billed. Finally, there is the conditional aspect of payment. If the referred client does not pay for services rendered, then petitioner will not receive his percentage.

The possibility that the client might not pay his obligation once services are performed is insufficient to cause the deferral of income for an accrual method taxpayer. *Key Homes, Inc. v. Commissioner*, 30 T.C. 109, 112-114 (1958), affd. per curiam 271 F.2d 280 (6th Cir. 1959); *First Savings & Loan Association v. Commissioner*, 40 T.C. 474 (1963). On the other hand, the prerequisite of performance of the services prior to any liability on the part of the obligor is an essential to satisfying the all-events test. The right to receive income cannot become fixed before the obligor has an obligation to pay. *McDonald v. Commissioner*, 217 F.2d 475 (6th Cir. 1954), revg. on other grounds a Memorandum Opinion of this Court. See also *Berger Engineering Co. v.*

*Commissioner,* T.C. Memo. 1961-292. Recognition of liability by the obligor is the essence of accrual. *Maryland Shipbuilding & Drydock Co. v. United States,* 187 Ct. Cl. 523, 409 F.2d 1363, 1367-1368 (1969).

The record in this case reflects that, with the exception of $1,250 of services performed in prior years, the billings and payments in question were performed and collected subsequent to the time of assignment of the income. The requirement that petitioner may have been called upon to consult is part of the contingency relating to the performance of the work prior to liability being established or fixed. The absence of consulting by petitioner is not decisive in the setting of this case. Additionally, as a corollary to the income principles, under section 461(h) a taxpayer is not entitled to a deduction under the accrual method unless there has been economic performance, i.e., the services have been performed or the property delivered.

With these principles as our guide, we hold that petitioner had not earned the fees in question prior to leaving BSI, with the exception of the $1,250 received for services performed in an earlier year. More specifically, we hold that petitioner earned the income in question while a partner of a partnership to which he had agreed to pay such income. With respect to substantially all of the fees in issue, BSI records reflect that clients were billed and payment received during the years in issue.[4] Moreover, if petitioner had refused a request for his consultation, it was, at very least, questionable whether he would have received his share of the fee if the work had been successfully completed without him. Petitioner was requested to and did provide further services with regard to clients from which about 90 percent of the fees were generated. We note that BSI did not request consultation with respect to $3,325 remitted during 1984. However, that amount was not earned as of the time of the assignment because the work had not yet been performed for the BSI clients (irrespective of whether or not

[4]With the exception of $1,250 for 1984, BSI records reflect a pattern of periodic billing of and payment by clients for work performed during each year. This indicates that we are not dealing with work already performed prior to petitioner's leaving BSI early in 1983. We also note that petitioner's 1983 taxable year is not in issue. That was the transitional year between petitioner's being an associate of BSI and becoming a partner of B&K. The likelihood of fees having been earned prior to petitioner's joining the B&K partnership would have been greater during 1983.

petitioner would be called upon to consult). Accordingly, with the exception of $1,250 for petitioner's 1984 taxable year, we hold that petitioner had not earned the income in question prior to leaving BSI and did not make an anticipatory assignment of income which had been earned.

Two additional related questions remain for our consideration. First, respondent argues that irrespective of when petitioner earned the income from BSI, "there was no relationship * * * [between] the past activity of introducing a client to * * * [BSI], and the petitioner's work as a partner with * * * [B&K or SSG&M]." According to respondent, petitioner should not be allowed to characterize as partnership income fees that did not have a requisite or direct relationship to a partnership's business. In making this argument, respondent attempts to limit and modify his longstanding and judicially approved position in Rev. Rul. 64-90, 1964-1 C.B. (Part 1) 226. See also *Bufalino v. Commissioner,* T.C. Memo. 1976-110; *Brandschain v. Commissioner,* 80 T.C. 746 (1983), both involving partnership agreements similar to the one described in Rev. Rul. 64-90.[5] Second, while we generally hold that petitioner did not make an assignment of income already earned, the possibility that this was an assignment of unearned income was not foreclosed.

These final two questions bring into focus the true nature of the potential conflict in this case—between respondent's revenue ruling and the assignment-of-income doctrine. Both questions, in their own way, ask whether any partnership agreement—under which partners agree in advance to turn over to the partnership all income from their individual efforts—can survive scrutiny under the assignment-of-income principles.

Rev. Rul. 64-90, 1964-1 C.B. (Part 1) at 226-227, in pertinent part, contains the following:

Federal income tax treatment of compensation received by a partner and paid over to a partnership where the partner, who uses the cash receipts and disbursements method of accounting, files his returns on a

[5]Respondent's attempt to limit the position in Rev. Rul. 64-90, 1964-1 C.B. (Part 1) 226, forces our consideration of the rationale underlying the ruling and to consider whether it comports with the principle of *Lucas v. Earl,* 281 U.S. 111 (1930). It is also noted that neither respondent's rulings nor related cases provide any basis for permitting the partnership to report the personal service income. Additionally, *Lucas v. Earl, supra,* is not distinguished in the ruling or cases.

calendar year basis and the partnership, which also uses the cash method, files its returns on a fiscal year basis.

I.T. 3824, C.B. 1946-2, 37, and Revenue Ruling 54-167, C.B. 1954-1, 152, amplified.

Advice has been requested regarding the Federal income tax consequences of a change in the terms of a partnership agreement to provide that all compensation received by the partners will be paid over to the partnership immediately upon receipt.

In the instant case, several individuals formed a partnership for the purpose of engaging in the general practice of law. Aside from the partnership business, each of the partners has performed services from time to time in his individual capacity and not as a partner. The several partners have always regarded the fees received for such services as compensation to the recipient as an individual.

The partnership which was formed in 1954 and uses the cash receipts and disbursements method of accounting files its Federal income tax returns for fiscal years ending January 31, and the partners file their individual returns on the cash method for calendar years. Each partner reports his distributive share of the partnership income, gain, loss, deduction or credit for the partnership fiscal year ending within the calendar year for which his individual return is filed. All compensation received by each partner for services performed in his individual capacity is reported in that partner's return for the calendar year when received.

It is proposed to amend the partnership agreement as of the beginning of the partnership's next fiscal year to provide that all compensation received by the partners be paid over to the partnership immediately upon receipt.

The question in the instant case is whether compensation remitted to the partnership pursuant to this provision will constitute partnership income.

Similar inquiries were previously considered by the Internal Revenue Service. * * * In both instances, it was pointed out that a partnership could not exist for the purpose of performing the services for which the compensation and allowances were received, and, thus, the recipient partner would be required to report the taxable portion of the compensation and allowances in his individual return, even though these items were pooled with partnership earnings. * * *

*In the instant case, the general practice of the partnership consists of rendering legal advice and services. Consequently, fees received by a partner for similar services performed in his individual capacity will be considered as partnership income if paid to the partnership in accordance with the agreement. Those fees need not be reported separately by the partner on his individual return. However, the partner's distributive share of the partnership's taxable income which he must report on his individual return will include a portion of such fees.* [Emphasis supplied.]

A key requirement of this ruling is that the services for which fees are received by individual partners must be *similar* to those normally performed by the partnership. See

also Rev. Rul. 80-338, 1980-2 C.B. 30 (enforcing same requirement); Rev. Rul. 54-223, 1954-1 C.B. 174 (same). Cases dealing with similar partnership agreement situations have also enforced this requirement. See *Hamm v. Commissioner,* 683 F.2d 1303 (10th Cir. 1982), affg. T.C. Memo. 1980-154; *Brandschain v. Commissioner, supra; Philbin v. Commissioner,* 26 T.C. 1159, 1167 (1956); *Bufalino v. Commissioner, supra.* Respondent now attempts to add to this requirement by arguing that the fees here in question were earned through activity, which was admittedly legal work, but was not sufficiently related to the work of petitioner's new partnerships. In other words, respondent argues that the income here was earned in BSI's business activity and not B&K's or SSG&M's business activity.

In *Hamm v. Commissioner,* T.C. Memo. 1980-154, *Mayes v. United States,* 207 F.2d 326 (10th Cir. 1953), affg. per curiam 106 F. Supp. 961 (E.D. Okla. 1952), was cited for the proposition that "Where a partner earns income for services performed outside of the scope of his partnership duties * * * the income is taxed to him even though he assigns it to the partnership." 40 T.C.M. 284, 285, 49 P-H Memo T.C. par. 80,154 at 748. In *Mayes,* an accountant and his son, who was a mechanic, were held to have anticipatorily assigned personal service income when they pooled their income in accord with a partnership agreement. Their partnership was formed to engage in real estate activity and to perform accounting services. See also *Mayes v. Commissioner,* 21 T.C. 286 (1953) (mechanic-son pursuing same issue in Tax Court). The courts deciding both the father's and the son's cases held that the services producing the income were performed not by the partnership, but by the individuals involved. Hence, the income had to be reported by those individuals. Neither court, however, based its holding on a test of the relationship of the income's source to the partnership activities. Rather, both courts observed, simply, that the father and son were the earners of their respective incomes. Both decisions concluded, without further explanation, that each should be taxed separately on his income. It should be noted that ostensibly neither taxpayer in the *Mayes* cases was skilled in and/or was able

to or did perform in the other partner's particular business activity.

In *Hamm,* the only issue for decision was whether compensation received by the taxpayer from his work as a judge was reportable by his law partnership or as personal income. The taxpayer's partnership had an agreement that income received by partners from appointed positions was to be pooled as partnership income. All of the income at issue was earned after the partnership had ceased to exist. The partners had agreed that any income earned after the dissolution date "belong[ed] exclusively to * * * [its earner] and not to the partnership." 40 T.C.M. at 285, 49 P-H Memo T.C. par. 80,154 at 748. Based on the above facts, it was held that the income was not reportable by the partnerships. It was also found that the taxpayer's judicial activities were outside the scope of his partnership duties.

Three aspects of this holding weaken its precedential value. First, the basis for the determination is unclear. The decision does not specify whether the taxpayer, in order to make a successful assignment for tax purposes, had to have been engaged only in the partnership's *type* of work, or if all assigned income had to be earned from actual partnership engagements. To the extent that the latter reasoning was adopted,[6] the *Hamm* decision contradicts respondent's ruling and supports his present position. In affirming the Memorandum Opinion of this Court, however, the Tenth Circuit relied solely upon the fact "that there was no continuing partnership for work performed * * * [and] income * * * earned after that date [when the partnership ended]" was not partnership income. *Hamm v. Commissioner,* 683 F.2d at 1304. The Circuit Court did not address the distinction between the practice of law undertaken by the partnership and the duties performed by a judge. Accordingly, the holding in *Hamm* regarding the scope of the taxpayer's partnership duties was rendered unnecessary. The partnership had ceased to exist before any of the income in question was earned. This fact was preemptively dispositive of the issue and the lower court could have disregarded the assignment on this ground alone.

---

[6]We did state: "[the taxpayer] did not serve as a district court judge on behalf of the partnership." *Hamm v. Commissioner,* T.C. Memo. 1980-154.

Finally, the *Mayes* opinions, on which *Hamm* was apparently predicated, do not provide any rationale or explanation for the proposition for which they were cited. Neither of the courts in *Mayes* made any reference to the scope of a partner's duties. Both courts simply held that the taxpayers had earned their income separately and were obligated to report it separately. Neither *Hamm* nor *Mayes* directly supports respondent's narrow characterization of the source of the income taxable through petitioner's partnerships.

Respondent's rulings have approved as partnership income fees generated by partners serving in individual capacities only tangentially related to the partner's employment in his or her partnership. See Rev. Rul. 80-338, 1980-2 C.B. 30 (accounting partner serving as executor); Rev. Rul. 54-223, 1954-1 C.B. 174 (partner working for another organization as a school bus driver).

Similarly, in *Bufalino v. Commissioner*, T.C. Memo. 1976-110, it was held that a partner in a dress cutting business could pool as partnership income amounts earned as a consultant to a cloth producing firm. Respondent argued that the income was earned by the taxpayer in his individual capacity because the consulting activities were outside the scope of the partnership's business. However, the consulting income was held to be sufficiently "within the ambit of the partnership business." 35 T.C.M. 494, 497, 45 P-H Memo T.C. par. 76,110 at 489. See also *Brandschain v. Commissioner*, 80 T.C. at 754, where it was held that a retired law partner's income from services performed as a labor arbitrator was considered partnership income even though the taxpayer argued *Hamm* applied because he was performing a judicial function.

There is no need for us to adopt a broader view of petitioner's partnership in this case. His referral fee income was clearly earned through activities "within the ambit" of the business of his new partnerships. Their business was the practice of law as was petitioner's consulting activity for BSI. His work was incident to the conduct of the business of his partnerships. We decline to adopt respondent's more narrow characterization of the business of petitioner's new partnerships. Neither the case law nor respondent's rulings support such a characterization.

Thus, we arrive at the final question in this case. We have already held that petitioner had not yet earned the majority of the income in question when he joined his new partnerships. Additionally, petitioner's fee income from his BSI clients qualifies, under the case law and respondent's rulings, as income generated by services sufficiently related to the business conducted by petitioner's new partnerships. If we decide that petitioner's partnerships should report the income in question, petitioner would be taxable only to the extent of his respective partnership share. This would allow petitioner, through his partnership agreements with B&K and SSG&M, to assign income not yet earned from BSI. Thus, the case law and respondent's rulings permit (without explanation), in a partnership setting, the type of assignment addressed by *Lucas v. Earl,* 281 U.S. 111 (1930).[7] We must reconcile the principle behind Rev. Rul. 64-90, 1964-1 C.B. (Part 1) 226, with *Lucas v. Earl, supra.* The question is whether income not yet earned and anticipatorily assigned under certain partnership agreements are without the reach of the assignment-of-income principle.

The Internal Revenue Code of 1954 provided the first comprehensive statutory scheme for the tax treatment of partners and partnerships. No section of the 1954 Code, successive amendments or acts, nor the legislative history specifically addresses the treatment of income earned by partners in their individual capacity but which is pooled with other partnership income. It is implicit in subchapter K, however, that the pooling of income and losses of partners was intended by Congress. This question is more easily answered where the partnership contracts with the client for services which are then performed by the partner. The question becomes more complex where the partner contracts and performs the services when he is a partner.

Moreover, no opinion contains a satisfactory rationale as to why partnership pooling agreements do not come within the holding of *Lucas v. Earl, supra.* Even in *Mayes* and *Hamm* (where the attempted pooling of income was treated as a prohibited assignment of income) it is suggested that in the appropriate circumstances, a partnership agreement

---

[7]See discussion in 3 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, par. 75.2.2, pp. 75-13 to 75-14 (1981).

that effectuates anticipatory assignments of income should be respected for tax purposes. Indeed, other opinions contain similar holdings. See *Brandschain v. Commissioner*, *supra* at 752; *Abbott v. Commissioner*, 30 B.T.A. 227 (1934); *Hillman v. Commissioner*, 2 B.T.A. 1265 (1925); *Bufalino v. Commissioner*, *supra*.

The fundamental theme penned by Justice Holmes provides that the individual who earns income is liable for the tax.[8] It is obvious that the partnership, as an abstract entity, does not provide the physical and mental activity that facilitates the process of "earning" income. Only a partner can do so. The income earned is turned over to the partnership due solely to a contractual agreement, i.e., an assignment, in advance, of income.

The pooling of income is essential to the meaningful existence of subchapter K. If partners were not able to share profits in an amount disproportionate to the ratio in which they earned the underlying income, the partnership provisions of the Code would, to some extent, be rendered unnecessary. See S. Rept. 1622, 83d Cong., 2d Sess., 89 (1954) (Finance Committee listing "flexibility" among partners as one of prime objectives of 1954 subchapter K reforms). See also *United States v. Basye*, 410 U.S. 441, 448-449 (1973), where the Supreme Court acknowledges partnerships as "independently recognizable [entities] apart from the aggregate of its partners" and that a partnership can, as an entity, earn income.

The provisions of subchapter K tacitly imply that the pooling of income is permissible. Said implication may provide sufficient reason to conclude that a partnership should be treated as an entity for the purpose of pooling the income of its partners. Under an entity approach, the income would be considered that of the partnership rather than the partner, even though the partner's individual efforts may have earned the income. If the partnership is treated as an entity earning the income, then assignment-of-income concepts would not come into play.

[8] One major variation exists in cases involving community property States, concerning which the Supreme Court distinguished *Lucas v. Earl*, *supra*, by holding that the earnings do not become the property of the husband, but instead are part of the marital estate. *Poe v. Seaborn*, 282 U.S. 101 (1930).

In this regard, an analysis of personal service corporations (PSC's) may provide, by way of analogy, some assistance in reconciling the principles inherent in Rev. Rul. 64-90, 1964-1 C.B. (Part 1) at 226, with those underlying *Lucas v. Earl, supra.* Keeping in mind Justice Holmes' desire to tax the "earner" of the income, we consider the assignment-of-income doctrine in the context of personal service corporation cases. In partnerships and personal service corporations an individual performs the services that earn income. In both, a separate entity—the partnership or personal service corporation—is cast as the "earner" for tax purposes. That characterization in both situations is, in essence, an assignment of income.[9] If, in either situation, the transfer to the entity is of income earned before an agreement to turn it over is entered into, the assignment-of-income doctrine will serve to invalidate the transfer.[10] In both the context of a PSC or partnership, transfers prior to the performance of a partner's services may be subject to the partner's or employee's control—in that either may refuse to perform.

In analyzing the status of personal service corporations, courts have relied upon the rationale that:

> the realities of the business world present an overly simplistic application of the *Lucas v. Earl* rule whereby the true earner may be identified by merely pointing to the one actually turning the spade or dribbling the ball. Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to produce corporate income. When a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer. Thus, a tension has evolved between the basic tenets of *Lucas v. Earl* and recognition of the nature of the corporate business form. [Fn. ref. omitted.]

---

[9] The same could be said of the normal corporate entity as well. The analogy only to PSC's, however, is slightly more apt because, as discussed below, the influence of the assignment-of-income doctrine depends to a large extent on the presence and status of the business form as an entity. In this regard, the corporate form and the partnership are at opposite ends of the spectrum. PSC's fall somewhere in between. This becomes clear through an analysis of the cases where the issue is whether the business form should be disregarded for tax purposes. Compare *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438-439 (1943) (regular corporation remains separate taxable entity so long as business activity conducted); *Keller v. Commissioner,* 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983) (PSC entity form respected because of contractual employment agreement); *United States v. Basye,* 410 U.S. 441, 448 (1973) (partnership an "independently recognizable entity" for reporting purposes but entity disregarded when determining partner's own tax liabilities).

[10] Note that in some cases the act of incorporation itself will ostensibly act as the agreement to turn over all income earned.

*Johnson v. Commissioner,* 78 T.C. 882, 890 (1982). See also *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943); *Foglesong v. Commissioner,* 621 F.2d 865 (7th Cir. 1980), revg. a Memorandum Opinion of this Court; *Keller v. Commissioner,* 77 T.C. 1014, 1031 (1981), affd. 723 F.2d 58 (10th Cir. 1983). Thus, an employee of a personal service corporation, or other corporate entity, is outside the holding of *Lucas v. Earl, supra,* to some degree because of the "entity concept." The business entity is cast as the earner of the income, obviating the need to analyze whether there has been an assignment of income.[11]

The same type of approach may be used with respect to partners of a partnership. In the same manner that a corporation is considered the earner of income gained through the labor of its employees, a partnership, with an appropriate partnership agreement, may be considered the earner of income.[12] Income earned prior to such an agreement, of course, remains within the principles and holding of *Lucas v. Earl, supra.* The link between respondent's Rev. Rul. 64-90, 1964-1 C.B. (Part 1) 226, and *Lucas v. Earl, supra,* must be the entity concept as it relates to partnerships.

The theory concerning partnerships as entities is not easily defined. It is well established that the partnership form is a hybrid—part separate entity, part aggregate. See *United States v. Basye, supra;* see also 3 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, par. 85.1, at 85-2 to 85-5 (1981); 1 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, secs. 4.01 through 4.06, at 4-1 to 4-8 (4th ed. 1989). The difficulty lies in deciding whether a particular set of circumstances relate to one end or the other of the partnership hybrid spectrum. The

---

[11]It should be noted that in all of these cases, the assignment to the corporation was of income not yet earned. That is, in situations where the entity was validly cast as the earner of the income, the factual pattern involved an incorporation and subsequent earnings by the incorporator. Situations involving contrary facts are usually considered assignments of income.

[12]We recognize that in a personal service corporation setting the person performing the service is an employee and that the contract to perform may be with the corporate entity. In a general partnership, the partners are principals and agents and not generally considered employees of the partnership. Partnerships, in the same manner as corporations, however, have employees who perform services contracted for by the partnership. That aspect draws a closer parallel between partnerships and personal service corporations for purposes of our analogy. This aspect does not answer the question concerning income of a partner becoming income of the partnership, but is concerned with the partnership's being treated as an entity for purposes of this issue.

Supreme Court in *Basye* stated that "partnerships are entities for purposes of calculating and filing informational returns but * * * they are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares." *United States v. Basye*, 410 U.S. at 448 n.8. This analysis provides some foundation for the idea that partners should report their distributive share, rather than the fruits of their personal labors. But it does not provide any guidance concerning the type of income or service that should be brought within the entity concept as it relates to partnerships.

The principle we must analyze in this case involves the role of the partnership with respect to the function of earning income. A general partnership[13] is "an association of two or more persons to carry on as co-owners a business for profit." Uniform Partnership Act sec. 6(1). Either a partnership or a corporation may enter into a contract with clients to perform services. In a partnership, however, either the entity or the individual may enter into contracts. The question we seek to answer is whether this distinction should be treated differently.

For purposes of an entity concept approach to partnerships, we must consider the type and source of income which should be included. Because we have already determined that the type of activity generating the income is relevant to an assignment-of-income analysis in the partnership setting, we focus our analysis of partnerships as entities on situations where the income is of a type normally earned by the partnership. Only in such situations has a partner acted as part of the partnership entity.

The entity concept as it relates to partnerships is based, in part, on the concept that a partner may further the business of the partnership by performing services in the name of the partnership or individually. The name and reputation of a professional partnership plays a role in the financial success of the partnership business. If the partners perform services in the name of the partnership or individually they are, nonetheless, associated with the partnership

---

[13]Our discussion focuses upon professional partnerships composed of general partners who are actively engaged in a business venture. The principles here may not apply to limited or general partners who are mere passive investors and are not involved in the income earning process of the partnership.

as a partner. This is the very essence of a professional service partnership, because each partner, although acting individually, is furthering the business of the partnership. See *Burnet v. Leininger*, 285 U.S. 136, 141 (1932), where partnership income was described as "produced * * * [by] the firm enterprise itself, that is, the capital of the firm and the labor and skill of its members employed in combination through the partnership relation in the conduct of the partnership business." Also as stated in *Ramos v. United States*, 260 F. Supp. 479, 485 (N.D. Cal. 1966), revd. 393 F.2d 618 (9th Cir. 1968) (the circuit court held the ultimate factual finding to be "clearly erroneous"), a partnership is:

a group of persons having a common business interest, working together in their respective spheres toward the successful operation and conduct of that business interest. It does not connote the idea that each and every working partner must punch a clock at eight o'clock in the morning and work continuously through the day until five o'clock. * * *

The lack of structure inherent in the partnership form does not lend itself to easy resolution of the assignment-of-income question. A partnership's characteristics do, however, militate in favor of treating a partner's income from services performed in an individual capacity, which are contractually obligated to the partnership for allocation in accord with the preestablished distributive shares, in the same manner as income earned through partnership engagement.

Accordingly, in circumstances where individuals are not joining in a venture merely to avoid the effect of *Lucas v. Earl, supra,* it is appropriate to treat income earned by partners individually, as income earned by the partnership entity, i.e., partnership income, to be allocated to partners in their respective shares.[14] To provide the essential continuity necessary for the use of an entity concept in the partnership setting, the income should be earned from an

---

[14]In following this approach we can also look to the safeguards that are observed in the corporate setting where the entity is being misused. "The assignment of income doctrine * * * continues to be an essential tool * * * where the corporation is not respected by the taxpayer/shareholders as a separate entity which carries on business activities." *Keller v. Commissioner,* 77 T.C. at 1033. (Fn. ref. omitted.) Moreover, while geared primarily toward the family partnership area, there is a body of partnership-oriented case law involving safeguards which may be similarly applicable to the type of circumstances considered here. See *Commissioner v. Culbertson,* 337 U.S. 733, 742 (1949), where a facts and circumstances approach was used to determine the intent of parties in forming a partnership.

activity which can reasonably be associated with the partnership's business activity. In the setting of this case, with the exception of $1,250 in 1984, petitioner was a partner of B&K or SSG&M when the fees were earned. Additionally, about 90 percent of the fees were, in part, earned through petitioner's efforts while he was a partner of B&K or SSG&M.

There is no apparent attempt to avoid the incidence of tax by the formation or operation of the partnerships in this case. Petitioner, in performing legal work for clients of another firm, was a partner with the law firms of B&K and SSG&M. In view of the foregoing, we hold that, with the exception of $1,250 for 1984, the fee income from BSI was correctly returned by the two partnerships in accord with the respective partnership agreements.

We find that petitioners are not liable for additions to tax under section 6653(a)(1) and (2) regarding the income received from BSI.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, WRIGHT, PARR, RUWE, COLVIN, and BEGHE, *JJ.*, agree with the majority opinion.

SWIFT and WHALEN, *JJ.*, concur in the result only.

---

BEGHE, *J.*, concurring: I generally try to apply Occam's razor to the solution of legal problems as well as logic problems. In this case, however, I believe a two-step journey along the right-angle sides of the triangle follows a clearer path to the correct result. The path along the hypotenuse is beset with the obstacles and pitfalls of the assignment-of-income doctrine, if it isn't led to a dead-end by the disquisition on the law of agency.

I reach the majority result in the following two steps. Even if the assignment-of-income doctrine requires petitioner to include in his gross income the amounts of the fees he earned and received from BSI after he became a

partner in B&K and in SSG&M, his payments of those amounts to B&K and SSG&M, pursuant to his agreements with those firms, entitled him to equivalent concurrent deductions as ordinary and necessary business expenses under section 162(a). See Kamin, "Partners Dealing with Each Other Through Partnerships," 46th Annual N.Y.U. Inst. on Fed. Tax 27-10 to 27-14 (1988) (example 3 and accompanying text). Those amounts thereby became partnership income distributable to all the partners, including petitioner, in accordance with the partnership agreements.

JACOBS, *J.*, agrees with this concurring opinion.

---

WELLS, *J.*, dissenting: With due respect, I cannot agree with the majority's analysis and conclusion with respect to the primary issue to be decided in the instant case. Consequently, I must dissent.

The critical threshold issue framed by the majority is whether the fees were paid to petitioner for services he performed prior to leaving BSI or for services he performed after he left BSI. If the fees were for services performed by petitioner prior to the time he left BSI, they are "past services" which should be taxed to petitioner under the rule of *Helvering v. Eubank*, 111 U.S. 122 (1940).[1] On the other hand, if the fees were paid to petitioner for services to be performed by him after he left BSI, they are future services, *Eubank* does not apply, and the income should be taxed to the partners of petitioner's subsequent law firms.

To decide the issue, we must ask what petitioner did to earn the fees in question. The analysis necessary to such an inquiry should be made by examining the agreement and course of dealing between petitioner and BSI. Instead, the majority inaptly uses accrual accounting principles to decide the issue and concludes that certain contingencies prevented the income from being earned by petitioner until after he

[1]*Helvering v. Eubank*, 111 U.S. 122 (1940), involved an insurance agent who assigned the right to receive future renewal commissions paid on account of services he had rendered in selling insurance policies. The Supreme Court held that the commission income should be taxed to the agent, reasoning that an assignment of the right to receive income paid on account of past services was insufficient to shift the incidence of taxation on such income from the earner.

left BSI. I submit that accrual accounting principles have little to do with the analysis of whether a cash method taxpayer should be taxed on fees earned by him. Furthermore, even if the majority uses such principles only by analogy, I disagree with the conclusion it reaches under its own analysis. When the agreement and course of dealing between petitioner and BSI are examined closely, I am impelled to conclude that the fees in question actually were paid on account of petitioner's services in bringing or referring the clients to BSI, or at the very least, that petitioner failed to carry his burden of proving that the fees were not paid for such services.

The majority has found that, during the period he worked for BSI, petitioner's compensation included a portion of the fees generated by clients he brought to the firm. When petitioner left BSI, his understanding with BSI was that he would continue to receive his percentage of the fees from such clients even if he had not been called upon to perform any consulting services. Petitioner was expected to consult with BSI regarding such clients, if called upon to do so, but neither BSI nor petitioner had contemplated whether petitioner would have been entitled to receive the fees if he refused to consult with BSI. Curiously, without a supporting finding of fact, the majority prefaces its analysis with the statement that "petitioner *believes* that his failure to consult would have resulted in loss of the fees." (Majority op. p. 647, emphasis added.) The majority is unclear as to whether such statement is fact or argument.[2] Even if the statement is fact, however, considering the other facts found by the majority, I cannot conclude that the fees were earned after petitioner left BSI. Rather, the record proves the opposite.

Several considerations support a conclusion that the fees were not earned by petitioner after he left BSI. As found by the majority, the basis of petitioner's entitlement to fees from BSI was the act of having brought or referred clients to BSI. Neither BSI nor petitioner contemplated that peti-

---

[2] In relying on petitioner's belief, the majority appears to suggest that the test of whether a taxpayer has earned income is subjective, and that income cannot be considered earned until the earner "believes" that he has earned it. Such a holding is contrary to established principles of income tax law and should not form the basis for deciding the true nature of a transaction for tax purposes.

tioner would be called on to "consult" with respect to any of BSI's other clients (those not referred by petitioner). Thus, petitioner's previous act of referring clients such as Prince and Terri Girl to BSI appears to be the only reason for a continued relationship between petitioner and BSI. Furthermore, the "consultation" services actually performed by petitioner must have been inconsequential, as the majority does not even take the trouble to detail them. We do not even know whether BSI billed the clients for such services. Indeed, BSI apparently could not have demanded any substantial services from petitioner in exchange for the fees. The amount of petitioner's fee was in no way related to the value of the services he performed. To the contrary, the amount of the fee was dependent upon the value of the services BSI rendered to the clients, a matter over which petitioner had little or no control. Finally, the fact that petitioner and BSI did not address whether petitioner's right to the fees would be jeopardized by his failure to consult indicates that BSI's right, and, for that matter, the clients' right to obtain additional services from petitioner was not important to them and was not the reason for the fee arrangement. As discussed above, petitioner's "belief" that such consultation was necessary appears to be nothing more than self-serving argument and, in any event, does not establish that performance of additional services was required in order to earn the fees. In that regard, the majority states that "it was, at very least, questionable" (majority op. p. 651) whether petitioner would receive his fee without performing consulting services. The majority's statement, however, is little more than speculation and appears to incorrectly place the burden of proof on respondent regarding the establishment of such fact. The majority's mere speculation and petitioner's unsupported assertion do not warrant the conclusion that the fees were not earned until after petitioner left BSI.

After obscuring the issue by grounding its analysis on accrual accounting principles, the majority finds that certain "contingencies" prevented petitioner from earning the income in question until after he had left BSI. Upon closer examination, the illusory nature of such contingencies becomes apparent. Petitioner's right to receive the fees was

contingent upon BSI's performance of services for the clients. While the fees were contingent upon the performance of services by BSI for the clients, such a contingency is not materially different than the one involved in *Eubank,* where the insurance agent's right to receive renewal commissions was dependent upon the policyholder's continued payment of premiums and maintenance of the insurance in force. *Eubank v. Commissioner,* 39 B.T.A. 583, 590 (1939), revd. 110 F.2d 737 (2d Cir.), revd. 311 U.S. 122 (1940). Because the commissions in *Eubank* had been earned for past services, such contingency did not prevent the insurance agent from being taxed on the commissions when they were paid. In the instant case, the majority finds an additional contingency, namely, the possibility that petitioner might be called upon to perform additional services. As discussed above, however, whether such a possibility is in fact a "contingency"[3] is speculative and uncertain.

Petitioner must show that the subsequent performance of services was the act giving rise to his right to the fees in order to put his case beyond the scope of *Eubank.* In my view, not only has he failed to do so, the majority's findings concerning the nature of the relationship between petitioner and BSI shows that the actual event giving rise to the right to the fees was the past services of petitioner in securing the clients for BSI. Accordingly, I would hold that the fee income was taxable to petitioner under assignment of income principles, as required by *Eubank.*

---

HALPERN, *J.,* dissenting: The majority perceives a conflict between the anticipatory assignment-of-income doctrine, see *Lucas v. Earl,* 281 U.S. 111 (1930), and the principle that partners may pool their earnings and report partnership income in amounts different from their contribution to the pool. With respect, I believe the conflict to be illusory, except insofar as the majority here today creates one where heretofore none existed.

---

[3]Because contingencies only go to the question of when income should be taxed, i.e. timing, rather than the question of to whom the income should be taxed, i.e., who is the true earner, the fact that a payment is subject to a contingency does not answer the latter question—it only answers the former.

According to the majority, the mere redistribution of income within a partnership is inconsistent with the assignment-of-income doctrine. "In partnerships and personal service corporations an individual performs the services that earn income. In both, a separate entity—the partnership or personal service corporation—is cast as the 'earner' for tax purposes. That characterization in both situations is, in essence, an assignment of income." (Majority op. p. 659; fn. ref. omitted.)

This analysis wholly ignores the doctrine of agency. When a partner, *acting as agent for the partnership*,[1] performs services for a client, the partnership is the earner of the income: the instrumentality (in this case the partner) through which the partnership has earned its fee is of no consequence. Therefore, the focus of the anticipatory assignment-of-income analysis ought to be on whether the partner acted for himself individually or as agent of the partnership. This is entirely consistent with the lattitude accorded partnerships to disproportionately distribute partnership income: the pertinent requirement is merely that the partnership income so distributed have been earned *by the partnership*. In this case, it is quite clear that petitioner earned the fees in question pursuant to an agreement he entered into, on his own behalf, with Ballon, Stoll & Itzler— an agreement that was consumated before petitioner's relationship with Bandler & Kass.[2] Consequently, petitioner is the true earner of the income and should not escape taxation by means of an anticipatory assignment. *Lucas v. Earl*, 281 U.S. 111 (1930).

The majority's "resolution" of the perceived conflict is unsatisfactory. The majority considers the determinative question to be whether the income is "of a type normally

[1] The Uniform Partnership Act, sec. 9(1), provides that a (general) partner is an agent of the partnership. Moreover, a partner has the power to bind the partnership to any act that is "for apparently carrying on in the usual way the business of the partnership of which he is a member," unless the third party knows of some restriction on that power. 1 A. Bromberg & L. Ribstein, Partnership, sec. 4.01(b), pp. 4:3-4:4 (1988) (quoting Uniform Partnership Act, sec. 9(1)).

[2] Had there been a novation, substituting the partnership for petitioner, then the partnership could properly be considered the earner of the income. In this case, however, there is no basis set forth in the majority opinion for concluding that a novation has taken place or that a substitution of Bandler & Kass for petitioner had been even discussed with Ballon, Stoll & Itzler. We are not privileged to simply assume a novation, since petitioner bears the burden of proof. Rule 142(a).

earned by the partnership. Only in such situations has the partner acted as part of the partnership entity." Majority op. p. 661. The majority requires merely that income "be earned from an activity which can reasonably be associated with the partnership's business activity." Majority op. pp. 662-663. Thus, the majority would allow a partner to assign fees to the partnership if the work performed for such fees is similar to that performed by the partnership, but not if the work is different. Majority op. pp. 653-654.

The majority's distinction is unprincipled.[3] The majority observes that "The name and reputation of a professional partnership plays a role in the financial success of a partnership business" suggesting that partners, even acting individually, can further the business of the partnership by adding to its reputation. Majority op. pp. 661-662. But, that may be so even if the partner acts individually, doing work entirely dissimilar to that normally performed by the partnership. In any event, the majority fails to explain why such an obviously incidental benefit to the partnership should permit us to frustrate the assignment-of-income doctrine. The majority asserts that "The lack of structure inherent in the partnership form does not lend itself to easy resolution of the assignment-of-income question." Majority op. p. 662. I must respectfully disagree. The lack of structure of the partnership form is irrelevant. All that matters is whether the partner has acted on his own behalf or on behalf, and as agent of, the partnership. Moreover, even if the lack of structure were relevant, the majority fails to explain why such would mandate the distinction between the type of income normally earned by the partnership and the type of income that is not. It would make far more sense to ask, with agency principles in mind, whether the income in question was earned by the partnership or by the partner acting as an individual.

Furthermore, I must disagree with Judge Beghe's concurring opinion on several grounds. First, section 721 would

---

[3]The majority fails to explain why the similarity of the work done by the partner to earn the fees to the work of the partnership is determinative. That failure not only casts doubt upon the correctness of this decision, but foreshadows the difficulty future courts will have in resolving the question: how similar is similar enough? Without any inkling of why similarity has been deemed important, future courts will lack any effective guidelines for answering that question.

seem to prohibit any deduction for petitioner's contribution of money to the partnership.[4] Second, the issue of a deduction under section 162 was not raised by the parties and thus is an inappropriate basis for decision. Third, the majority opinion does not set forth sufficient facts to determine, under the theory of the concurring opinion, the timing of any available deduction.

For the foregoing reasons, I respectfully dissent.

---

[4]The article cited by Judge Beghe deals with contracts that are not partnerships for tax purposes. See Kamin, "Partners Dealing With Each Other Through Partnerships," 46th Annual N.Y.U. Inst. on Fed. Tax 27-3, n.5 (1988). Consequently, that article does not address the argument that sec. 721 precludes a deduction in this case.